No. 66,492

STATE OF KANSAS, *Appellee*, v. JOE EVANS, *Appellant.*

(834 P.2d 335)

Opinion filed May 22, 1992.

*Rebecca E. Woodman*, assistant appellate defender, argued the cause, and *Kaye Messer*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*John J. Gillett*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by the defendant, Joe Evans, from his convictions of felony murder in violation of K.S.A. 1991 Supp. 21-3401(b), aggravated kidnapping in violation of K.S.A. 21-3421, and aggravated robbery in violation of K.S.A. 21-3427. His sentence was enhanced under K.S.A. 1991 Supp. 21-4504, and he is serving consecutive terms of two life sentences for felony murder, two life sentences for aggravated kidnapping, and 30 years to life for aggravated robbery.

Haney Kenworthy, an 84-year-old widow, lived in an apartment in Neodesha, Kansas. The husband of one of Mrs. Kenworthy's nieces told defendant Joe Evans that he had seen Mrs. Kenworthy get money out of a metal box in her apartment and that he thought she had thousands of dollars. He also told Evans, who was his uncle, where Mrs. Kenworthy lived and that she lived alone. He gave the information to Evans in the hope of receiving something if Evans robbed her.

On March 8 or 9, 1990, Evans unsuccessfully tried to convince his son, Jeff Evans, to participate in robbing an "old lady." Evans unsuccessfully tried to recruit Don Wry, one of his sons-in-law, to help him rob Mrs. Kenworthy. Evans told Wry that he had posed as a census taker to check out the situation.

Then Evans unsuccessfully tried to recruit Don Wry's nephew, Richard Dickey. Evans told Dickey that they would tie up Mrs. Kenworthy, knock her in the head, and take her money.

Evans also unsuccessfully tried to recruit David Foster, a life-long acquaintance. Evans told Foster that Mrs. Kenworthy had more money than she needed, that they would go into her house, tie her up with pantyhose or hose, "thump her in the head and take care of business."

Evans returned to his son Jeff. He offered to help Jeff get a car and $5,000 if he would help rob Mrs. Kenworthy. Jeff said he would help.

The next morning, March 15, they drove from Jeff's trailer in Springdale, Arkansas, to Evans' trailer in Independence, and then drove on to Neodesha. On the way, Evans told Jeff to get a small weighted bat, called a "Fishing Knocker" or "Fishing Whacker," out of the pocket of a coat which was lying on the floorboard. Evans showed Jeff how to use the bat and told him to hit Mrs.

Kenworthy on the side of the head. Evans said they would hit her on the side of the head, tie her up, take the money, and leave.

When they got to Mrs. Kenworthy's apartment, she was not at home. They drove back to Independence because Evans did not want to burglarize the apartment.

At mid-day they returned to Neodesha and to Mrs. Kenworthy's apartment. Evans told her that he needed to ask her some more census questions and that Jeff was a trainee; she let both men into the apartment.

When Evans gave the signal, Jeff hit Mrs. Kenworthy on the side of her head. He hit her three times before she fell down on the couch. When Evans began to tie her up, he told Jeff to go into the bedroom to find the money. While Jeff was looking, Evans came into the bedroom, took some money out of a purse he found under the bed, and said, "Let's go."

As they were leaving, Jeff noticed that Mrs. Kenworthy had been tied up and was not lying in the position she had been in when he went into the bedroom. Earlier she had been up on the couch with her legs at one end and her head at the center. As they were leaving, her knees were down on the floor.

On the drive back to Independence, Evans asked if Jeff thought they had killed Mrs. Kenworthy. Jeff did not think they had killed her because she was still moving around when he went into the bedroom and because she was fighting Evans while he was trying to tie her up.

Evans and Jeff threw a clipboard and the bat out of the car as they drove. They counted the money and found that there was $920. Evans gave Jeff $300 and kept the rest.

They stopped briefly in Independence before driving to Bartlesville, Oklahoma, where they made some purchases at the Dock 44 store, then drove to Tulsa where they ate at a restaurant and stopped at several other stores before returning to Jeff's trailer in Springdale, Arkansas.

The first issue asserted by the defendant on appeal is whether there was sufficient evidence to allow a rational trier of fact to have found the defendant guilty beyond a reasonable doubt. Evans contends that aggravated kidnapping requires a live victim and that the evidence shows that Mrs. Kenworthy was not alive

when he committed the acts which constitute the crime of aggravated kidnapping. The State does not dispute that aggravated kidnapping requires a live victim, but the State argues that there is sufficient competent evidence from which the jury could find that Mrs. Kenworthy was alive as she was being bound and gagged.

In support of the proposition that aggravated kidnapping, as a matter of law, requires a live victim, Evans relies on *State v. Perkins*, 248 Kan. 760, 811 P.2d 1142 (1991), and *State v. William*, 248 Kan. 389, 807 P.2d 1292 (1991).

In *Perkins*, the court referred to the discussion in *William* as follows:

"In *State v. William*, 248 Kan. 389, 807 P.2d 1292 (1991), this court considered whether attempted aggravated criminal sodomy could be committed against a dead body. As a starting premise, this court said: 'William correctly argues that criminal sodomy (or aggravated criminal sodomy) may not be committed on a dead body.' 248 Kan. at 400. Because of the close analogy between aggravated criminal sodomy and rape, the same rule applies: Rape can only be committed against a living person." 248 Kan. at 771.

The court offered this further explanation why rape requires a live victim:

"K.S.A. 21-3502(1) begins, 'Rape is sexual intercourse with a person.' 'Person' implies a living person. The statute goes on to define the circumstances when sexual intercourse is rape (a) when the victim is overcome by force or fear; (b) when the victim is unconscious or physically powerless; (c) when the victim is incapable of giving consent because of mental deficiency or disease. All these circumstances require that the victim be living when the act of intercourse takes place." 248 Kan. at 771.

Following the rationale of *Perkins*, we conclude that the charge of aggravated kidnapping in this case required a live victim. "Person," as used in 21-3421 implies a living person, and the circumstances when a kidnapping occurs require that the victim be living when the acts constituting the crime take place.

With regard to the sufficiency of the evidence, this court recently stated:

"When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a

rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Graham*, 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990).

Evans concedes that Jeff testified that Mrs. Kenworthy "was scratching [Evans] and fighting him when he was trying to tie her up." He argues, however, that the medical evidence establishes that her death occurred while Jeff was hitting her and before Evans touched her.

The medical testimony was given by Dr. David DeJong, who performed an autopsy on Mrs. Kenworthy. She had considerable bruising and swelling on the right side of her head, including the ear and eye. Her skull was broken on the right side. Most of the injuries to the brain were located in this area. They were injuries which might cause unconsciousness, but would not be expected to cause death within a matter of minutes or even in several hours.

She had a large laceration consistent with a blow from a blunt object on the back of her head and a similar but smaller laceration high on the right side of her head. There was very little blood associated with these lacerations.

A "very significant finding" was that Mrs. Kenworthy had gastric material in her airway, within her throat, and in her pharynx. She had vomited material from her stomach into her mouth and then had aspirated it. The quantity of vomit in her mouth suggested that she already had been gagged. Gastric material in the airway can prevent breathing and cause death within minutes or even seconds. Vomiting may occur as a result of head injury.

Dr. DeJong believed that in the most likely sequence of events there was at least one blow to her head before she vomited, that she was gagged at the time, and that she thrashed around as she struggled to breathe. He believed that the multiple blows to her head and the hemorrhages in her right eye indicated a struggle and efforts to control her.

Dr. DeJong dismissed the suggestion that the absence of traces of Evans' skin or hair under her fingernails was evidence that she had not struggled with him. He testified that it is "a very rare thing" when identifying material is found under a victim's fingernails.

Contrary to Evans' contention, the medical evidence does not establish that Mrs. Kenworthy's death occurred before he touched

her. Viewing the evidence in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt of aggravated kidnapping.

Next, the defendant contends there was insufficient evidence to convict him of aggravated robbery. Evans argues that the money which was taken from Mrs. Kenworthy was taken from the bedroom while she was in the living room of her apartment. Thus, the taking was not in her presence. We find no merit in the defendant's argument.

K.S.A. 21-3426 provides as follows: "Robbery is the taking of property from the person or presence of another by . . . force." K.S.A. 21-3427 provides that "[a]ggravated robbery is a robbery committed by a person . . . who inflicts bodily harm upon any person in the course of such robbery."

In *State v. Glymph*, 222 Kan. 73, Syl. ¶ 2, 563 P.2d 422 (1977), the court stated the following:

"When a victim's possession and control of property is severed by force or threat of bodily harm, it is *held* that the taking is from his 'presence' as that term is used in statutes defining robbery, although prior to the time the property is taken, the victim is forcibly removed from the premises and the taking is not within his immediate view."

Opinions from other states were examined, and a number of situations were described which had been found "to constitute a taking from the presence of the victim, even though the victim did not see or hear the taking, and was not in the immediate vicinity at the time the taking occurred." 222 Kan. at 75. The situations included one "where the victim was left tied in one room while the taking occurred in other portions of the building." 222 Kan. at 75. We conclude there was sufficient evidence for the jury to find the defendant guilty of aggravated robbery beyond a reasonable doubt.

We next consider if the district court should have instructed the jury on the lesser included crime of theft. Evans contends that his act of taking money from Mrs. Kenworthy's bedroom constituted theft. He characterizes theft as a lesser included offense of aggravated robbery because it is a lesser included offense of robbery, which is a lesser included offense of aggravated rob-

bery. He contends that the theft instruction should have been given even though he did not request it.

The State responds that Evans' request for an instruction on robbery was denied because there was no factual issue as to whether bodily harm was inflicted on Mrs. Kenworthy. If the facts would not warrant an instruction on robbery, the State argues, Evans cannot "leap frog" over it to an instruction on theft.

The standard for appellate review of a complaint that the district court failed to instruct on a lesser included offense has recently been stated by this court as follows:

"Normally, the test of whether an instruction on a lesser included offense is required is whether there is any substantial evidence tending to prove that lesser included offense. A corollary to this rule is that an instruction on an included offense is not proper if from the evidence the jury could not reasonably convict of the lesser offense. In reviewing the evidence to determine whether a lesser included instruction should have been given, this court must review the evidence in a light most favorable to the defendant." *State v. Perkins*, 248 Kan. 760, Syl. ¶ 11.

K.S.A. 21-3107(3) provides in pertinent part as follows:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

The district court is under an affirmative duty to give an appropriate lesser included offense instruction even if the defendant does not request it. *State v. Sutherland*, 248 Kan. 96, 101, 804 P.2d 970 (1991). However, "[i]f the evidence at trial excludes a theory of guilt of a lesser offense, the failure to instruct the jury on some lesser degree of the crime charged is not grounds for reversal." 248 Kan. 96, Syl. ¶ 2. In this case the evidence excludes a theory of guilt of theft. Theft is a crime against property, as evidenced by its inclusion in Chapter 59.00, Crimes against Property, in PIK Crim. 2d. There is no element of bodily harm involved. The evidence against Evans was that he and his son killed a woman for the purpose of taking her money.

For the same reason, the evidence in this case excludes a theory of guilt of robbery. There is an element of *threat* of bodily harm involved in robbery. Here, there was the infliction of bodily harm.

Defendant next argues that the district court erred in not excluding the photographic identification evidence. Evans complains of the admission of evidence of photographic identifications made by Paula Lamendola and Marcee Martin. Because the issues differ, the complaints will be considered separately.

Lamendola saw one man helping another out of the driver's side of a dark blue car, which was parked near Mrs. Kenworthy's apartment on the afternoon of her murder. She saw the younger man's face. There is no indication in her testimony that she saw the other man's face. The police showed her three photographic lineups, and in the third group she identified Jeff Evans as that younger man.

There was no objection to Lamendola's testimony. When the State offered the photographic lineup into evidence, the defense objected. The district court treated the objection as a motion to suppress. It was overruled on the following ground:

"[T]he identification has nothing to do with the identifying of the defendant. It's merely a part of the investigatory process used in this case, and I don't think any of the Constitutional safeguards and rules concerning identification has any bearing or any relation to identifying witnesses that are used in the subsequent prosecution. I think that the point that you're raising could be raised in the trial of Jeffrey Evans, assuming that's who's going to be identified as the person whom she picked out in the line-up. But where that doesn't include any indication that she's trying or attempting to identify the defendant in this case, I don't think any of those matters apply. And I think once you get past that, then the only issue is whether or not they laid a foundation to admit it into evidence as part of their ongoing presentation of their case, and that foundation has obviously been met."

Evans states that the issue presented is whether a defendant has standing to object to an impermissibly suggestive identification procedure when the person identified is an accomplice rather than the defendant. He relies on *People v. Bisogni*, 4 Cal. 3d 582, 94 Cal. Rptr. 164, 483 P.2d 780 (1971). There, the California Supreme Court said:

"The reason for excluding identification evidence based on an unfairly conducted showup is that such evidence is unreliable as a matter of law and may result in the conviction of innocent persons. [Citations omitted.] Obviously such evidence is equally unreliable when it is directed toward the identity of a coparticipant in a crime as when it relates to the identity of the defendant on trial. Accordingly, whenever the identity of a confederate is essential to prove the defendant's participation in a crime and when, as

here, such evidence effectively destroys the defense offered by the defendant, he has standing to challenge the fairness of the identification procedures of the alleged coparticipant." 4 Cal. 3d at 586.

In response, the State does not mention the issue of standing. Instead, the prosecution's focus is on the nonessential nature of the identification evidence. At best, the prosecution argues, the evidence is merely corroborative of Jeff Evans' testimony. We agree.

The rationale of the California Supreme Court in *Bisogni* is neither persuasive nor applicable in the present case. The facts are distinguishable. In *Bisogni*, the coparticipant was a Mrs. Gordon. The defendant's alibi was that he and Mrs. Gordon were somewhere else at the time the armed robbery was committed. The identification of Mrs. Gordon as one of the robbers obviously would destroy the defendant's alibi. Mrs. Gordon was neither tried with nor testified against the defendant. Under those circumstances, the California court held that "evidence of Mrs. Gordon which was tainted by an unfair showup would have the effect of denying the defendant due process." 4 Cal. 3d at 586.

No Kansas case is cited, nor are we aware of any Kansas cases centering on a question of the admissibility of evidence of the pretrial identification of a coparticipant. Our research has failed to find the ruling in *Bisogni* on this issue either followed or cited in other California decisions or by the courts of any other state.

Although we need not decide the questions raised about the pretrial identification procedure, it does not appear that it created a substantial likelihood of irreparable misidentification. Lamendola testified that she got a good look at the younger man's face. She was able to discern an angry expression on his face. The man in the photograph she identified is smiling, but Lamendola testified that, even with the different expression, she was "sure" of the identification. She described him as "young, dark hair, medium build." Moreover, Jeff Evans testified at trial for the State and admitted that he was the younger man who participated in the killing and robbery of Mrs. Kenworthy. Lamendola's identification added little if anything to his admission. We conclude that the district court correctly overruled the defendant's objection to the lineup and identification of Jeff Evans.

We next consider the identification of the defendant by Marcee Martin. Marcee Martin was working as a cashier/sales clerk at a Dock 44 store in Bartlesville on the day Mrs. Kenworthy was killed. She specifically remembered seeing Evans in the store that day. She testified that Evans bought a bra and paid for it with a $100 bill. When Evans' residence was searched, a sales receipt was found which was identified at trial by Martin as being the receipt that she "rang up" for the bra sale.

The information in the preceding paragraph was elicited by the State on direct examination of Martin. There was no reference made during direct examination to photographic evidence. On cross-examination, Evans' counsel questioned Martin about photographs which had been shown to her by the police.

This court does not permit a litigant to "invite error and then complain of that error on appeal." *State v. Gray*, 235 Kan. 632, Syl. ¶ 4, 681 P.2d 669 (1984); see *State v. Salton*, 238 Kan. 835, Syl. ¶ 1, 715 P.2d 412 (1986). Hence, Evans' argument that the district court erred in allowing Martin to testify concerning her identification of his photograph is without merit.

Finally, we consider if the district court erred in imposing the maximum sentence allowed by statute. Evans contends that the district court impermissibly manipulated his sentence to predetermine his parole eligibility. In support of this contention, Evans quotes the district court judge as saying, "It's my intent that you spend as long as at all possible behind bars." Evans relies on *State v. Dubish*, 236 Kan. 848, 696 P.2d 969 (1985).

His reliance on *Dubish* is misplaced. The court's ruling in that case is that a sentence of probation on one conviction and imprisonment for other convictions arising out of the same incident is not a disposition authorized by K.S.A. 21-4603. 236 Kan. at 855. The matter of manipulating the sentence to predetermine parole eligibility was discussed because that was the rationale offered by the district court judge for the unusual sentence he imposed. 236 Kan. at 849. There is no issue of inconsistency among the sentences imposed for Evans' three convictions.

This court has consistently held that a "sentence imposed will not be disturbed on appeal if it is within the limits prescribed by law and the realm of trial court discretion and not a result of partiality, prejudice, oppression, or corrupt motive." *State v.*

*Nunn*, 247 Kan. 576, Syl. ¶ 1, 802 P.2d 547 (1990). There is no allegation that the sentence of Evans resulted from partiality, prejudice, oppression, or corrupt motive. Nor is it alleged that it is outside the limits prescribed by the legislature.

According to Evans, abuse is manifest in that the practical effect of the sentence will be life imprisonment for him. He has not brought any legal authority for this proposition to this court's attention. The district court judge's expressed intention to cause Evans to remain in prison for the maximum length of time allowed by the legislature and the imposition of the maximum sentences do not amount to an abuse of discretion.

The judgment is affirmed.