No. 70,255

STATE OF KANSAS, *Appellee*, v. BILLY T. REED, *Appellant.*
(886 P.2d 854)

548

Opinion filed December 16, 1994.

*Rick Kittel*, assistant appellate defender, argued the cause, and *M. Kristine Paredes*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Kerwin L. Spencer*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

Davis, J.: The defendant, Billy T. Reed, appeals his murder conviction and his sentence of life with a mandatory 40 years' imprisonment. He contends that the trial court committed reversible error in three of its rulings prior to the sentencing phase

of the trial. He also contends that his sentence must be vacated because of five defects in the sentencing phase of his trial. We, however, conclude that there is no reversible error and affirm for the reasons set forth in this opinion.

On Saturday afternoon, December 5, 1992, the victim, M. T., 16, and her friends, D. L., 17, and M. K., 16, traveled to Wellington from their homes near South Haven. They planned to visit friends and spend the night with M. K.'s step-uncle, the defendant. They also wanted the defendant, age 41, to buy alcohol for them.

A friend of the girls took them to the house of Chuck Flynn in order to find the defendant. The defendant was watching television at Flynn's house and told the girls he would purchase alcohol for them later. He did not say anything about whether or not the girls could stay at his house.

At approximately 8:00 p.m., the girls were riding around town with a friend when they saw the defendant on the street and flagged him down. The defendant then went into a liquor store and purchased two bottles of Everclear for the girls. Although he would not be home, the defendant gave the girls permission to go to his house to drink the alcohol.

The girls went to the defendant's house, mixed the alcohol with Pepsi, and played a drinking game. By an hour later, the girls had consumed most of the alcohol and M. T. was feeling sick. The group decided that their friend, Buck Rowan, would drop M. K. and D. L. off at the Coastal Mart and then take M. T. to the Scotsman's Restaurant and attempt to sober her up with coffee. They would then meet at the Coastal Mart around midnight.

Buck Rowan testified that M. T. was highly intoxicated. He did not stop at the restaurant because a sheriff's car was parked outside. He drove around looking for M. K. and D. L. M. T. was sick and throwing up most of the time. He decided to take her back to the defendant's house. She was still drunk at the time, and he could not get her to walk into the house. Finally, Buck's brother came by and helped him carry M. T. into the defendant's house. Buck testified that they put M. T. onto the couch, took off her shoes, and put a blanket over her.

As Buck and his brother were leaving, the defendant pulled up. Buck told the defendant that M. T. was in the house on the couch. The defendant indicated that Buck should have put her on the waterbed because the couch was where he slept. Buck then left. Buck thought it was around 2:00 a.m. when he dropped off M. T.

In the meantime, D. L. and M. K. had been riding around with two other friends, Josh Wolf and Charlie Callahan. At 1:30 a.m., they stopped by the defendant's house to see if M. T. was there, but no one was home. At around 2:30 a.m., they saw Buck at the Scotsman's and he told them about leaving M. T. at the defendant's house. D. L. and M. K. went by the defendant's house around 3:30 a.m. but no one was there. Eventually they began riding around with Jeff Bevan and Jason Meslin. Although Jeff Bevan testified that he took the girls past the defendant's house at around 2:30 a.m., D. L. testified that they did not get into the car with Bevan and Meslin until 4:00 a.m. In any event, no one was home when they went by the house.

Bevan and Meslin then dropped D. L. and M. K. off at the Coastal Mart. Eventually the two girls returned to the defendant's house to get M. K.'s drivers' license. Again, no one was home. They left again and returned later to find the defendant's pickup in front of the house. As they entered, the defendant was sitting in a chair directly in front of the door. According to M. K., he had a gun-cleaning rod in his hand. The defendant told M. K. that some man had brought the victim into the house and that defendant had told her she needed to find somewhere else to stay. He stated that he had gone to the bathroom and when he got out, the victim had walked out the door.

D. L. and M. K. searched for M. T. on foot until approximately 8:00 a.m. They then returned to the defendant's house and fell asleep on the waterbed. The defendant was asleep on the couch. The defendant awakened the girls at 9:00 a.m. and drove them home to South Haven. There, they picked up clean clothes and went back to Wellington. The girls left the defendant's house at around 10:30 a.m. and continued to search for M. T., but to no avail. The girls testified that they noticed no stains in the defendant's pickup.

Chuck Flynn, a friend of the defendant's, testified that on Saturday night, he and the defendant had gone to a bar in Belle Plaine. They left the bar a little after 10:00 p.m. to go back to Wellington, and on the way they stopped off at the side of the road. According to Flynn, the defendant saw a deer at the side of the road and he took a .22 caliber rifle from underneath the seat and shot the deer. After the defendant cut the deer's throat and left it to let it bleed, he and Flynn went back to Wellington. They arrived in Wellington around 11:00 p.m. and stopped at the Town & Country store to get gas.

At the store, they saw the defendant's daughter, Stacy. They then went to the defendant's house to check whether the girls were still there. No one was at the house, so they drove back into the country and got the deer. They then came back to Wellington and went to the Coastal Mart for awhile before heading back to the defendant's house.

When Flynn and the defendant went to the defendant's house, the defendant went inside. According to Flynn, the defendant then came back out and told Flynn he was going back inside to turn down the stereo. Flynn followed the defendant in and saw M. T. sleeping on the couch. Flynn testified that he went into the bathroom and when he came out, the defendant was leaning over M. T. and fondling her breasts. M. T. woke up and told the defendant to leave her alone; the defendant slapped her. Flynn testified that at that point he walked outside.

According to Flynn, the defendant then came outside and stated that he needed help carrying M. T. to the truck so that he could have sex with her. Flynn helped the defendant put M. T. in the pickup. The defendant and Flynn then drove out into the country between Wellington and South Haven. Flynn testified that M. T. was passed out at this time.

The defendant stopped the truck in the country and turned off the lights. He then began trying to take M. T.'s top off, and stated that he was "going to fuck her." Flynn testified that the defendant also got his rifle from the driver's side of the cab and told M. T. to be quiet or he would shoot her.

Flynn testified that he wanted nothing to do with the situation and got out of the pickup and began walking. According to Flynn,

he saw M. T. attempt to get out of the pickup, and he heard the defendant say, "Be quiet or I'll shoot you." After that, he heard a gunshot, and he got scared and began running.

Flynn stated that after awhile he began walking. Around 25 minutes later, the defendant drove up to where Flynn was and asked if he wanted a ride back to town. M. T. was no longer in the pickup and Flynn noticed no stains in the truck. The defendant stated that he was going to get rid of the gun and a knife.

Flynn stated that the defendant took him home at about 2:10 a.m. He did not see the defendant again until the next morning, when the defendant came by to borrow a gas can. The defendant told Flynn that he wanted to go out to the country and burn the insulation off some copper wire. The defendant took Flynn to the Coastal Mart to get some cigarettes and pop at about 11:30 or 12:00 that morning.

Flynn also testified that he saw the defendant the following Wednesday night. The defendant informed him that M. T. had come up missing and that they needed to get their stories straight. The defendant stated that he did not kill M. T. and that he wanted Flynn to be sure and tell everyone that the defendant was with him until 2:00 a.m. On cross-examination, Flynn admitted that he had previously told three different stories to police. Flynn stated that he had done so because he was scared and did not want to get into trouble.

On Sunday, Darell Oestmann, Dave Kelly, and Thane Yunker were coyote hunting out in the country. Oestmann testified that he noticed a blue and white or blue and silver pickup backing out of an abandoned farmstead. Oestmann stated that he was not sure if it was the defendant's pickup or if the defendant was driving. Dave Kelly stated that he did not know the driver's name but identified the defendant in open court as the driver. Thane Yunker testified that he knew the defendant by sight and that the defendant was the driver of the pickup. Yunker testified that after M. T. turned up missing, he called the police to report that the defendant had been near the farmstead because he had heard that she had last been seen at the defendant's house.

Scott Rowe, a friend of the defendant's, testified that the defendant came over to his house on Sunday at approximately 1:00

p.m. They talked, and the defendant asked Rowe's mother how to get pheasant blood out of a jacket. The defendant and Rowe then went to the laundromat. Rowe testified that there were tar-like stains on the seat and newspapers covering up part of the seat.

At the laundromat, they washed a jacket that had a bloodstain on it. They then went to the defendant's house, and the defendant began talking about M. T. and asking Rowe what would happen if M. T. were not found. Rowe stated that the defendant often talked about M. T. in the next week, asking what would happen to him and what kind of evidence the police had to have. Rowe told the defendant that police would have to find a murder weapon or fingerprints to charge someone. At one point, the defendant stated he wished he could have taken M. T. home.

Captain Harold Thatcher of the Wellington Police Department talked with the defendant at 12:18 a.m. Monday. When Thatcher told the defendant that he needed to talk to him, the defendant responded: "About [M. T.]?" The defendant indicated to Thatcher that he had come home at 2:00 a.m. and Buck Rowan had told him M. T. was on the couch. He said that he told M. T. she would have to leave and that she reluctantly did so. According to the defendant, M. T. was not intoxicated. The defendant told Thatcher that after M. T. left, he went to bed and slept the rest of the night.

After interviewing some of the other people involved, Thatcher went back to visit the defendant at 4:15 p.m. on Tuesday. Thatcher noticed that while there was snow on the ground, there were large bare spots near the defendant's trash cans. The defendant told him that someone had stolen his trash on Sunday. The defendant also indicated that his trash barrel had been stolen on Monday.

When Thatcher asked the defendant about the night in question, the defendant indicated that he had gone to bed after M. T. left and had slept all night. When Thatcher advised him that M. K. had checked his house that night and he was not there, the defendant suddenly remembered he had gone to the Town and Country for a cup of coffee and then came back and had

gone to sleep. When Thatcher told him that M. K. and her friends had come back around 4:00 a.m. and he was not home, the defendant remembered that he had gone to the Town and Country to find a carving knife in order to cut up some deer ribs. When he could not find one, he came back and slept the rest of the night. When Thatcher mentioned that the girls had gone to his house at approximately 4:45 a.m. and he was not home, the defendant told him that he could not sleep and had decided to drive out near Oxford. The defendant explained that he had not told the truth earlier because he was nervous about buying alcohol for the girls and feared that he was going to get into trouble.

On Thursday, police arranged to have the defendant's trash picked up. In the trash, the police found the front panel of a pair of ladies' blue and white flowered underwear, which was later identified as belonging to M. T. In addition, police found a 20-ounce Pepsi bottle with blood on the outside, some blue tissues with hair fibers, a Top Fresh bread sack with blood on the outside, a tag from a bra, denim scraps with hair fibers, a two-liter Pepsi bottle with blood on it, and a ponytail tie.

On Friday, after Thane Yunker had mentioned to police that he had seen the defendant in the country Sunday, police searched the abandoned farmstead where the defendant had allegedly been. M. T.'s decapitated body was located at the bottom of a cistern on the property. The body was nearly nude, with a pair of jeans pulled down around the ankles, a red shirt looped over one of the wrists, and a white bra looped over both wrists. The head was also located at the bottom of the cistern. Police also photographed tire tracks in the driveway of the farmstead. The tire tracks matched the tread on the rear tires of the defendant's pickup.

Dr. William Eckert performed an autopsy on M. T.'s body. He found that death had been caused by a .22 caliber gunshot wound from the back to the left side of the head. He stated that M. T. had circulation at the time of the shooting and bled somewhat after, and concluded that 10 minutes of bleeding would have been sufficient to cause death.

According to Dr. Eckert, there were some indications that M. T. still had circulation when she was decapitated. However, he

could not be positive that she was alive at that time. There were also several stab wounds to the neck, although Dr. Eckert could not tell if M. T. had been alive when they were delivered. The body also had some cuts and scratches but no defensive injuries. There were no powder burns and no real way of telling how far away the gun had been when the shot occurred.

At trial, the State sought to introduce photographs taken during the autopsy for the purpose of helping the jury to understand Dr. Eckert's testimony. The defendant objected, arguing that the gruesome photographs were more prejudicial than probative. After consideration, the district court admitted some of the photographs.

The defendant was arrested on Friday, December 11. A search of the pickup truck found a dark tar-like stain on the back of the seat. An analysis of the stain indicated that it contained human blood. Certain sections of the seat cushion of the truck had been cut away. A search of the defendant's residence revealed a new jar of Vaseline with .22 caliber shells pushed down into the petroleum jelly.

The jury found the defendant guilty of one count of first-degree murder and three counts of furnishing alcoholic liquor to a minor. A hearing was then held to determine whether the hard 40 sentence should be imposed. The State presented the testimony of S. M., an acquaintance of the defendant's, who testified that the day before the murder, the defendant came to her house at 2:00 a.m. and offered her money to masturbate him. When she refused, he came back later and offered her more money simply to take her clothes off while he masturbated. When she again refused, the defendant pushed her up against the wall and began fondling her, until she kicked him and he fled.

The State also presented the testimony of E. H., who testified that when she ran away from home and went to the defendant's house, he hid her there and lied to her mother about her whereabouts. The parties stipulated that the defendant had previously pled guilty to misdemeanor theft in return for the dismissal of a burglary charge and also pled guilty to criminal trespass. The parties also stipulated that the defendant had committed criminal damage to property as a juvenile.

At the conclusion of the evidence, the jury found that the following aggravating circumstances were present: (1) that the defendant committed the crime in an especially heinous, atrocious, or cruel manner and (2) that the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution.

The defendant filed a motion for new trial. At the hearing on the motion, the defendant presented evidence that Chuck Flynn had told another version of the night's events in a statement to a police officer investigating charges against Flynn for aggravated kidnapping, aiding a felon, and perjury.

In his new statement, Flynn told police that when the defendant took M. T. out to the country and began fondling her, M. T. woke up and began struggling. She called out for Flynn to help her, and Flynn told the defendant to stop. The defendant did not listen, however, and continued trying to rape M. T. Flynn got out of the pickup, and the defendant and M. T. continued struggling. In the course of the struggle, M. T. managed to fall out of the pickup. According to Flynn, the defendant then got out of the pickup with his rifle and shot M. T. in the back of the head. He then began to stab M. T. in the neck and then cut her head off, at which point Flynn ran away.

The district court found that this newly discovered evidence would not have resulted in a different verdict and denied the motion for new trial.

The defendant contends that the trial court erred (1) by admitting gruesome photographs of the victim over his objection; (2) by failing to give an instruction on accomplice testimony; and (3) by denying his motion for a new trial based on newly discovered evidence. The defendant also argues that five defects during the sentencing phase of the trial detailed below require reversal.

## Gruesome Photographs

The defendant contends that the district court erred in admitting gruesome photographs depicting M. T.'s body at various stages of the autopsy. He argues that the photographs had little probative value and that value was outweighed by their prejudicial effect on the jury.

The admission of photographs in a homicide case is a matter within the trial court's discretion, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion. *State v. Stone*, 253 Kan. 105, 111, 853 P.2d 662 (1993). While photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. 253 Kan. at 111.

The defendant correctly notes that while the admission of gruesome photographs is rarely held to be an abuse of discretion, this court has done so in cases where the probative value was slight and the prejudicial effect great. See *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975) (holding trial court abused discretion in admitting photograph of victim "laid out like a disemboweled beef in a packing plant," where photograph was repetitious and cause of death not in dispute). However, it is well settled that photographs which serve to illustrate the nature or extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death. *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990).

The first photograph of which the defendant complains is Exhibit 13. This photograph shows the victim's head held several inches above the torso and shows the wounds on the neck. At trial, the State proffered that the photograph shows the wounds on the head and torso and shows that the head is the one belonging to the body.

The defendant argues that the probative value of this photograph was slight, in that M. T.'s injuries were adequately described by Dr. Eckert and the body had already been identified. Nevertheless, the photograph is a true representation of the nature of the wounds suffered by M. T. and was admissible to corroborate the testimony of Dr. Eckert as to the knife wounds and decapitation.

The next photograph in dispute, Exhibit 14, shows a side view of M. T.'s severed head and additional injuries to the neck. Again,

the State proffered that this photograph identified the victim and showed the extent and number of the stab wounds. Although Exhibit 14 appears to be somewhat repetitious in light of the previous photograph, it does show the nature and extent of additional stab wounds which cannot be clearly seen in Exhibit 13.

Exhibit 15 shows the decapitation itself from an almost top perspective as well as some drag marks on the shoulder. The State argued that the photograph was relevant to show the drag marks as compared to the stab wounds. Once again, the photograph is relevant to show the injuries and the way in which the body was disposed. The photograph accurately depicts the injuries to the body and is corroborative of Dr. Eckert's testimony.

Finally, the defendant objects to the admission of Exhibit 7, which shows a view of most of the torso. The State asked that it be admitted to show the scrapes and slide marks on the body. The defendant argues that if it was necessary to show the scrape marks, the photograph could have been enlarged to remove the prejudice caused by showing the torso laid out on the slab. However, the photograph accurately depicted the body and the way in which the body may have been moved by defendant. The photograph is helpful in showing the jury the extent of the scrape marks and how they differ from the injuries suffered.

We have held that special care should be taken in admitting photographs taken after a pathologist has intervened in order that the evidence not be more gruesome than necessary. See *State v. Prouse*, 244 Kan. 292, Syl. ¶ 1, 767 P.2d 1308 (1989). The photographs admitted in this case show no marks made by Dr. Eckert. Any marks on the body were essentially attributable to the defendant. The photographs, although gruesome, accurately depicted the victim's body and its injuries and served to corroborate the testimony of Dr. Eckert. The district court did not err in admitting them.

Accomplice Instruction

The defendant did not request an accomplice instruction and contends that the district court's failure to give such an instruction was clearly erroneous. He argues that Flynn was an accomplice,

and under the circumstances of the case, the court should have instructed the jury to consider Flynn's testimony with caution.

Where a defendant does not request a jury instruction on accomplice testimony, the failure of the district court to give that instruction will not be disturbed unless it is clearly erroneous. *State v. Thomas*, 252 Kan. 564, Syl. ¶ 7, 847 P.2d 1219 (1993). A jury instruction is clearly erroneous only if the reviewing court reaches a firm conclusion that there is a real possibility the jury would have reached a different verdict absent the error. *State v. Deavers*, 252 Kan. 149, 164-65, 843 P.2d 695 (1992).

The defendant argues that Flynn's testimony was substantially uncorroborated by the evidence. He cites *State v. Novotny*, 252 Kan. 753, Syl. ¶ 2, 851 P.2d 365 (1993), for the proposition that it is error for a trial court to refuse to give an instruction on the testimony of a paid informant when the testimony is wholly uncorroborated, the testimony provides the sole basis for conviction, and the defendant requests such an instruction. However, *Novotny* also states that where no such instruction is requested and such testimony is substantially corroborated, the absence of the instruction is not error. 252 Kan. 753, Syl. ¶ 2.

The defendant did not request an accomplice instruction, and Flynn's testimony was neither wholly uncorroborated nor the sole basis for the defendant's conviction. Circumstantial evidence independent of Flynn's testimony pointed to the defendant as the killer, including the defendant's presence at the scene, articles of bloody, torn clothing of the victim found in his trash, bloodstains in his pickup, matching tire tracks, and the defendant's ever-changing story of the events of the night in question. We conclude that based on all of the evidence, there is no real possibility that the jury would have returned a different verdict had the accomplice instruction been given.

### Newly Discovered Evidence

The defendant contends that the trial court erred by not granting him a new trial based on the final story told by Flynn after the defendant's completed trial. He argues that the changed story affects the credibility of Flynn and that the changed story would

not support a finding of premeditation on the part of the defendant. The trial court denied the defendant's motion for new trial, concluding that the new evidence provided a better explanation of what occurred at the scene and would not change the result.

The granting of a new trial on the grounds of newly discovered evidence is a matter within the trial court's discretion; a new trial should not be granted unless the evidence is of such materiality that it would be likely to produce a different result upon retrial. The credibility of the evidence offered in support of the motion is for the trial court's consideration. *State v. Redford*, 248 Kan. 130, 131, 804 P.2d 983 (1991).

The defendant argues that if the jury had realized that Flynn had testified to a new and different story, his testimony would have been much less credible. However, the jury was aware at the time of trial that Flynn had already previously told three different stories about the events in question. We are unable to conclude that another version of events by Flynn would have a devastating effect on Flynn's credibility. Moreover, we have said that new trial should not be granted on the basis of newly discovered evidence which tends only to impeach or discredit the testimony of a witness. *State v. Richard*, 235 Kan. 355, 363, 681 P.2d 612 (1984).

The defendant also argues that he should be allowed a chance to cross-examine Flynn about his sudden new story. The defendant contends that effective cross-examination is so essential to a fair trial that when it is denied prejudice need not be proven in order to reverse, citing *State v. Humphrey*, 252 Kan. 6, 845 P.2d 592 (1992).

The defendant's argument misconstrues *Humphrey*. In *Humphrey*, the defendant was prevented by the court from cross-examining a key prosecution witness about whether she was currently working for the police. In this circumstance, we stated that the denial of effective cross-examination amounted to constitutional error of such magnitude that no showing of prejudice is required. 252 Kan. at 17. In this case, the defendant was given the opportunity to cross-examine Flynn about his prior inconsistent versions of the events. There is no indication that further

cross-examination on the subject would have had an effect on the jury verdict.

The defendant further argues that Flynn's new story would have affected the outcome of the trial because there is no evidence of premeditation in Flynn's new testimony. According to the defendant, without Flynn's previous testimony, there was no evidence from which the jury could have found premeditation.

The problem with the defendant's argument is that he did not present it to the trial court. At the motion for new trial, the defendant argued only that his conviction should not be based on the perjured testimony of Flynn and that the jury would have come to a different result if they had been informed of Flynn's new testimony. An issue which was not presented to the trial court may not be raised on appeal. *State v. Ji*, 251 Kan. 3, 17, 832 P.2d 1176 (1992).

Even if we were to consider the defendant's contention, Flynn's new statement establishes that the defendant opened the door of his pickup, walked around to the front of the pickup, pointed the gun at Flynn, and then aimed and fired one shot into the back of the victim's head. The defendant then walked back to the truck, got out his knife, and began to decapitate M. T. while she was still breathing. While proof of premeditation is not to be inferred from the use of a deadly weapon alone, other circumstances, such as lack of provocation, the defendant's conduct before and after the killing, or the dealing of lethal blows after the victim has been rendered helpless, may be sufficient to support premeditation. *State v. Phillips*, 252 Kan. 937, 939, 850 P.2d 877 (1993). We, like the district court, conclude that Flynn's new statement would not have affected the outcome of the trial. Accordingly, the court did not err by denying the defendant's motion for new trial.

### Sentencing Phase

The remainder of the defendant's argument deals with the sentencing phase of the trial. He argues that the trial court erred because its instruction defining the terms "heinous," "atrocious," and "cruel" were unconstitutionally vague and that the evidence was insufficient in any event to support a finding that the murder

was committed in an especially heinous, atrocious, or cruel manner. He also argues that there was insufficient evidence to establish the existence of the second aggravating circumstance—the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution. Tied to this contention, the defendant claims that the State committed prosecutorial misconduct by telling the jury that it could find that the defendant committed the crime to avoid prosecution based on his conduct of hiding the body. Finally, the defendant claims that the supplemental jury instructions and the verdict forms misinformed the jury and violated K.S.A. 1993 Supp. 21-4624(5), the Eighth Amendment, and the defendant's due process rights.

### Instructions and Evidence on Heinous, Atrocious, and Cruel Manner

The jury found beyond a reasonable doubt the existence of the following two aggravating circumstances: (1) *that the defendant committed the crime in an especially heinous, atrocious, or cruel manner* and (2) that the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution. The jury also concluded that these circumstances outweighed mitigating circumstances and recommended imposition of the hard 40 sentence. The defendant contends that considering the facts in the light most favorable to the prosecution, a rational factfinder could not have found that he committed the crime in an especially heinous, atrocious, or cruel manner. See *State v. Evans*, 251 Kan. 132, 135-36, 834 P.2d 335 (1992). Specifically, the defendant claims that the evidence failed to establish that the victim was alive when stabbed and decapitated.

Applying the appropriate standard expressed in *Evans* above, we are in agreement with the defendant's contention. The only trial testimony establishing that the stabbing and decapitation occurred while the victim was still alive was the testimony of Dr. Eckert. He testified that the blood on the top of the torso of the victim was some indication that there was circulation when the head was cut off. However, Dr. Eckert admitted that he could not be certain that the victim was alive at the time of the de-

capitation. We have reviewed the record and conclude that there was simply no way to determine whether the stabbing and decapitation occurred before or after the death of the victim, even when considering the evidence in the light most favorable to the State. The only testimony as to this matter comes from Dr. Eckert. Other testimony bearing on this question amounts to conjecture or speculation.

In light of our conclusion that the evidence was insufficient to establish the first aggravating circumstance, we need not discuss the defendant's contention that the trial court's instruction on the terms heinous, atrocious, and cruel was unconstitutionally vague. Our conclusion, however, does not end the inquiry or necessarily require us to vacate the hard 40 sentence imposed.

K.S.A. 1993 Supp. 21-4624(5) provides that "[i]f, by unanimous vote, the jury finds beyond a reasonable doubt that *one or more* of the aggravating circumstances enumerated in K.S.A. 1993 Supp. 21-4625 . . . exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced pursuant to K.S.A. 1993 Supp. 21-4628." (Emphasis added.) The existence of one aggravating circumstance may alone be sufficient to support the sentence imposed. See *State v. Bailey*, 251 Kan. 156, 178, 834 P.2d 342 (1992).

Sufficiency of Evidence that the Defendant Committed the Crime to Avoid Prosecution and Prosecutorial Misconduct

In *State v. Kingsley*, 252 Kan. 762, 851 P.2d 370 (1993), the defendant argued that if we concluded the jury erroneously found any of the aggravating circumstances, the hard 40 sentence would have to be vacated. We rejected this argument, noting that even in death penalty cases the sentence would not necessarily be vacated. "In *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983), imposition of the death penalty was upheld despite the appellate court's striking one of three aggravating circumstances as being unconstitutional." 252 Kan. at 794.

In *State v. Bailey*, 251 Kan. at 176, we discussed the relationship between aggravating and mitigating factors and our respon-

sibility under the following provision of K.S.A. 1993 Supp. 21-4627(3)(b): "whether the evidence supports the findings that an aggravating circumstance or circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances." In *Bailey*, 251 Kan. at 178, we said: "[W]e have examined the record thoroughly and reviewed the evidence in light of each aggravating factor singly and find that the mitigating circumstances are so weak that we would affirm the sentence even if only one of the aggravating circumstances would have been found constitutionally valid." The same conclusion may be drawn in this case. The defendant was 41 years old and had a prior criminal record, and the record contains no evidence of diminished capacity.

The defendant argues that there was no evidence presented that he killed the victim to avoid or prevent a lawful arrest or prosecution. When the sufficiency of evidence is challenged for a conviction in a criminal case, the standard of review on appeal is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Evans*, 251 Kan. at 135-36. A similar standard applies when the sufficiency of evidence is challenged for establishing an aggravating circumstance in a hard 40 sentence: whether, after a review of all the evidence on this issue, viewed in a light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt.

The defendant is correct that no direct evidence was presented on this issue. However, the record contains substantial circumstantial evidence bearing on this issue. The defendant intended from the beginning to have sex with the victim. He fondled her breast at his house while she was passed out. His act woke her, and she told him to leave her alone. The defendant slapped her. The defendant then solicited help from his friend to help him put the victim in his truck so that he could have sex with her and presumably contend with her resistance in an isolated area.

The defendant drove the victim to an isolated spot in the country, near an abandoned farmstead which had a cistern located on

the property. He attempted to have sex with the victim. When she resisted, he shot her in the head, stabbed her in the neck several times, and cut off her head. Her almost nude body, with jeans pulled down around the ankles, a red shirt looped over one of the wrists, and a white bra looped over both wrists, was found at the bottom of a cistern located on the abandoned farmstead. The head of the victim was also located at the bottom of the cistern.

The defendant's stated purpose of taking the victim to the country was to rape her. She had resisted verbally in his house. He picked an isolated, abandoned farmstead with a cistern located on the property to accomplish his stated purpose. After his attempt failed, he killed her, dragged her body and head to the cistern, and concealed both at the bottom of the cistern "in order to avoid or prevent a lawful arrest or prosecution" for kidnapping or attempted rape. See K.S.A. 1993 Supp. 21-4625(5).

The defendant furthered his concealment by disposing of evidence in his trash, removing bloodstains from his jacket and truck, lying to the police concerning his activities that evening and morning, and advising his friend that they must get their stories to agree.

The defendant argues that the circumstantial evidence relates to concealment of his crime of murder, which would not support the aggravating circumstance found by the jury. He argues that the jury could have found the aggravating circumstance simply on the basis that the defendant concealed the body and head of the victim.

In further support of his argument, the defendant contends that the prosecutor's following statement in closing argument amounted to prosecutorial misconduct and misled the jury into thinking that it could find the existence of the aggravating circumstance simply on finding the defendant hid the body:

"[T]here could be no other reason for dispossession of the body in the manner other than in an attempt to hide the crime to prevent a lawful arrest or prosecution . . . I submit to you one of the factors for you to consider is the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution."

We note that the prosecutor in the above remarks did not identify the crime the defendant committed. While evidence may relate to the defendant's efforts to conceal his murder of the victim, the same circumstantial evidence also relates to his concealment of kidnapping or attempted rape of the victim and directly bears upon the aggravating circumstance of avoiding or preventing a lawful arrest or prosecution. The defendant apparently contends that the evidence establishes that he was attempting to avoid arrest or prosecution for the murder. His contention ignores his stated purpose for taking the victim to the country. His actions, if concealment of the body had been successful, would have avoided or prevented a lawful arrest or prosecution for kidnapping or attempted rape. We have held that circumstantial evidence is sufficient to establish even the gravest of offenses. *State v. Richmond*, 250 Kan. 375, Syl. ¶ 5, 827 P.2d 743 (1992).

We further note that the defendant did not object to the remark made by the prosecutor on closing. While we conclude that the remark does not amount to prosecutorial misconduct, we further note that reversible error cannot be predicated upon a complaint of misconduct of counsel in closing argument where defendant does not object. *State v. Crabtree*, 248 Kan. 33, 37, 805 P.2d 1 (1991).

Finally, we conclude that the circumstantial evidence of record without question is sufficient for a rational factfinder to have found the existence of the aggravating factor that the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution.

### Supplemental Jury Instructions and the Verdict Forms

The defendant's final argument is that the supplemental jury instructions and the verdict forms misinformed the jury. According to the defendant, the jury instruction given informed the jury that it had to unanimously agree on either a hard 40 sentence or a life sentence with parole eligibility after 15 years. The defendant did not object to the jury instruction, and under our standard of review, unless the instruction is clearly erroneous, we will not reverse.

K.S.A 1993 Supp. 21-4624(5) provides that the jury must unanimously reach its verdict of a mandatory 40 years' imprisonment. However, if the jury is unable to reach a verdict, the defendant is sentenced to a life sentence with parole eligibility in 15 years.

The instruction given to the jury in this case provided two alternative verdicts: life imprisonment with parole after 15 years or the hard 40 sentence. The instruction erroneously advised the jury that "[y]our agreement upon each verdict must be unanimous." The defendant argues that the instruction misled the jury into believing that it had to unanimously find one of the two verdicts, rather than advising the jury that it had to unanimously find the hard 40 verdict, and if it did not do so, the life sentence with parole eligibility after 15 years would be applied.

It is apparent that the above instruction does not fairly state the law. However, under our standard of review of whether an instruction is clearly erroneous, the question is whether there is a real possibility the jury would have reached a different verdict absent the error. *State v. Deavers*, 252 Kan. at 164-65.

As set forth above, the circumstantial evidence establishing the aggravating circumstance was substantial. We are able to reach a firm conviction that the instruction, as given, did not prejudice the defendant. There is no real possibility the jury would have reached a different verdict. Moreover, as discussed below, there is little, if any, evidence to establish the existence of mitigating factors. Given the substantial circumstantial evidence establishing the existence of the aggravating circumstance and little, if any, evidence relating to mitigating factors, the erroneous instruction presents no real possibility that the jury would have reached a different verdict.

The defendant also contends that the instruction concerning unanimous verdicts was confusing because it did not inform the jury that it did not have to unanimously agree on each possible mitigating factor. The defendant argues that it is possible the jury would believe that each mitigating factor would have to be agreed upon unanimously, rather than simply a unanimous agreement as to whether the mitigating factors were outweighed by the aggravating factors.

The instruction on mitigating factors given by the court states:

"If you find beyond a reasonable doubt that there are one or more aggravating circumstances and that they outweigh mitigating circumstances, then you shall recommend a mandatory minimum term of 40 years. If you recommend that the defendant shall serve a mandatory minimum term of 40 years, you must designate upon the verdict form with particularity the aggravating circumstances which you found beyond a reasonable doubt.

"If you have a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, then it is your duty to return a verdict of life imprisonment with parole eligibility in 15 years."

This court was confronted by a similar situation in *State v. Kingsley*, 252 Kan. at 795-96. We did not reach the issue because we found that mitigating factors were completely nonexistent and therefore the instruction was not error. The defendant's case presents the same situation as existed in *Kingsley*. The only mitigating factors suggested by the defendant, in this case, are that he had no significant history of prior criminal activity, that he had no capacity to appreciate the criminality of his conduct or conform the requirements of the law, and that his age was a mitigating factor. There is little if any evidence to support these factors. The defendant was 41 years old at the time of the murder and had a prior criminal record, and there was no evidence of diminished capacity.

In *State v. Walker*, 252 Kan. 279, 307, 845 P.2d 1 (1992), we found that a similar instruction adequately stated the law and the fact that mitigating circumstances need not be unanimously found did not have to be spelled out in the instructions. We stated:

"Clearly, the jury was instructed that for an aggravating factor or factors to be found, the jury must do so unanimously and beyond a reasonable doubt. No such requirement is set forth as to mitigating factors. Defendant contends the absence of such requirement as to mitigating factors should have been spelled out in a specific instruction. We do not agree. We believe that the instructions as given adequately state the law in this regard." 252 Kan. at 307.

The instruction given fairly conforms to K.S.A. 1993 Supp. 21-4624(5). Although one of the instructions that followed it states that the jury's verdict must be unanimous, nowhere is it stated that each mitigating factor must be unanimous. As we stated in *Walker*, the instruction given adequately states the law.

Affirmed.

ALLEGRUCCI, J., concurring and dissenting: Although I agree with the majority in affirming the defendant's conviction, I dissent from the majority's holding that the evidence of the aggravating circumstance that the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution was sufficient. I agree with the defendant that the State must prove beyond a reasonable doubt that the defendant murdered M.T. to avoid or prevent a lawful arrest or prosecution. The defendant avoided or prevented arrest or prosecution for what crime by murdering M.T.? Furnishing liquor to a minor? There is no evidence, let alone beyond a reasonable doubt, that he murdered M.T. to avoid or to prevent arrest or prosecution for any other crime. Obviously, his actions following the murder were to prevent arrest and prosecution for the murder. That is not tantamount to committing the murder for the purpose of avoiding or preventing arrest for some other crime. It is the murder itself that is committed to avoid or prevent arrest and not the concealment of the murder that constitutes the aggravating circumstance. The majority responds to the defendant's argument by relating his alleged sexual acts against M.T. The majority then states: "His actions, if concealment of the body had been successful, would have avoided or prevented a lawful arrest or prosecution for kidnapping or attempted rape."

The fact is the defendant was not successful in his concealment, and the defendant was not arrested for, charged with, or convicted of attempted rape or any other act other than selling liquor to a minor and murder. The State's evidence could not possibly support a finding beyond a reasonable doubt that the defendant killed M.T. to prevent arrest and prosecution for kidnapping or attempted rape. The error is compounded by the court's failure to define the terms or clarify the aggravating circumstance to the jury. In addition, the statement by the prosecutor to the effect the defendant's concealing M.T.'s body was sufficient to find this aggravating circumstance further compounded the error.

I also dissent from the majority's holding that the instruction requiring the jury to unanimously agree on either a hard 40 sen-

tence or a life sentence with parole eligibility after 15 years was not clearly erroneous. To conclude that there is no real possibility the jury would have reached a different verdict ignores the reality of the effect such an instruction has on jurors and the dynamics of jury deliberation. Further, the verdict form perpetuated the error. The lesser sentence of life with parole eligibility after 15 years is not an alternative sentence for the jury to decide. It is the alternative sentence the court imposes if the jury fails to find the existence of an aggravating circumstance or that the aggravating circumstances are outweighed by the mitigating circumstances. I would set aside the sentence and remand for resentencing.

HOLMES, C.J., and SIX, J., join in the foregoing concurring and dissenting opinion.