No. 77,884

STATE OF KANSAS, *Appellee,* v. SCOTT O. MCKINNEY, *Appellant.*
(961 P.2d 1)

Opinion filed May 29, 1998.

*Jessica R. Kunen*, chief appellate defender, argued the cause and was on the brief for appellant.

*Jennifer J. Brunetti*, assistant county attorney, argued the cause, and *Julie E. Richey*, county attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Scott McKinney appeals his jury convictions of premeditated first-degree murder and aggravated robbery in one incident and of robbery in another. He also appeals his hard 40 sentence for the murder.

In July 1995, McKinney underwent treatment at Osawatomie State Hospital. After being discharged from the treatment center, he returned to his home in Pittsburg. McKinney's grandmother knew William Barnett and introduced him to McKinney.

In September 1995, Barnett's body was found on the floor in his dining room. An autopsy showed that he had been stabbed in the neck and throat approximately 20 times. He had bruises and abrasions scattered over the upper part of his body. His lip and tongue appeared to have been bruised when trapped between the teeth. Bruises on his neck, a fracture of the hyoid bone at the base of the tongue, hemorrhaging around the hyoid and the thyroid cartilage, and small hemorrhages inside the eyelids indicated that sufficient pressure had been applied to his neck to collapse the airway and cause asphyxiation. Death did not come quickly because no major blood vessels were cut. Twenty milliliters of bloody fluid in Barnett's stomach indicated that "he was alive during the stabbing and swallowed some of the blood."

McKinney told law enforcement officers that he had killed Barnett. He said he "just decided to go by Bill's house" and that from the outside he could see someone else was there, so he went around to the back of the house and waited for the other person

to leave. Eventually McKinney went to a club for awhile before returning to Barnett's house. McKinney reported that after they had talked for 10 to 20 minutes, Barnett got very defensive and blamed McKinney for his goddaughter's problems. McKinney described how he killed Barnett:

"I just grabbed him and started like giving him a headlock or something and he wouldn't go down. And I wrestled him and I wrestled him finally to the ground and I gave him a headlock and it seemed like it must have went on for fifteen, twenty minutes and finally he—he quit breathing or . . . I thought he did and I—I got up and I looked around and . . . I couldn't find my glasses and then I found mine and then I found his under the buffet, but I left his there and when I was leaving the back door he said Scott, Scott[,] and I turned around and he was half way getting up again and I got him back down and I started choking him and banging his head. By this time he was—he was this way and I totally . . . reversed him around this way and . . . I got off of him and there was some—some kind of little scissors of some sort and I just started puncturing him in his throat and he wouldn't die and so I got up, I grabbed a steak knife and I cut some part of his left neck and blood went everywhere on his face.

. . . .
". . . And he—he was saying my name and I could hear him swallowing blood.

. . . .
". . . I put something over his face."

McKinney also told the officers that he broke the steak knife when he used it on Barnett's neck. Before leaving, McKinney took Barnett's billfold, money clip, and money. He went to a bar where he talked to someone named Keith about how to cash a check that was in the billfold. When the bar closed at 2:30 a.m., he went home and drank all night. The following day was Friday. He went to several banks trying to cash the check. McKinney also told the officers that he grabbed the purse of a woman he saw on the street and ran with it.

Glenda Evans testified that on Friday, September 22, 1995, she had cashed some checks at the bank and walked outside. According to Evans, "this guy had watched me and he grabbed my thing that I had the money in and took out." She continued, "I was opening the door of my car and he pushed me up against a door and grabbed it." McKinney told police that he got $300 or $400 from her.

Defendant challenges the constitutionality of K.S.A. 22-3302, which governs competence to stand trial. It has been long and firmly established in this country that "[a] defendant may not be put to trial unless he "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him.' " *Dusky v. United States*, 362 U.S. 402 (1960)." *Cooper v. Oklahoma*, 517 U.S. 348, 354, 134 L. Ed. 2d 498, 116 S. Ct. 1373 (1996). The criminal trial of an incompetent defendant would violate due process. *Medina v. California*, 505 U.S. 437, 453, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992). In determining whether a defendant is competent, a State may presume that he or she is competent and require the defendant to shoulder the burden of proving his or her incompetence by a preponderance of the evidence. 505 U.S. at 449. A State may not, however, require the defendant to prove his or her incompetence by clear and convincing evidence. *Cooper*, 517 U.S. at 355-56.

In the courts of this state, proceedings to determine competence are governed by K.S.A. 22-3301 and K.S.A. 22-3302. K.S.A. 22-3301(1) provides:

"For the purpose of this article, a person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable:
(a) To understand the nature and purpose of the proceedings against him; or
(b) to make or assist in making his defense."

K.S.A. 22-3302(3) provides, in part:

"The court shall determine the issue of competency and may impanel a jury of six persons to assist in making the determination. The court may order a psychiatric or psychological examination of the defendant. To facilitate the examination, the court may: (a) If the defendant is charged with a felony, commit the defendant to the state security hospital or any county or private institution for examination and report to the court . . . ."

"On appeal, the reviewing court's inquiry on a trial court's determination that a defendant is competent to stand trial is whether the trial court abused its discretion." *State v. Peckham*, 255 Kan. 310, Syl. ¶ 6, 875 P.2d 257 (1994).

In the present case, McKinney challenges the constitutionality of Kansas' statutory scheme for determining competence to stand

trial. He contends that the statutes' silence on burden and standard of proof leaves the door open for imposition of an improper burden on a defendant.

This issue is controlled by our recent decision in *State v. Cellier*, 263 Kan. 54, 948 P.2d 616 (1997). Cellier made the same constitutional challenge to the competency statute, *i.e.*, the absence of an evidentiary standard makes the statute unconstitutional. We noted that, of the three possible evidentiary standards which applied to the statute, "clear and convincing" or "beyond a reasonable doubt" had been found by the United States Supreme Court to violate due process. We further noted: "If at all possible, statutes are to be interpreted in a constitutional manner. The only way to constitutionally interpret 22-3301 and 22-3302 is to find that their implicit evidentiary standard is a preponderance of the evidence standard." 263 Kan. at 69-70. We then held:

"The trial court measures the evidence presented by the standard of preponderance of evidence. With a statutory presumption that an accused is sane, *State v. Gilder*, 223 Kan. 220, 227-28, 574 P.2d 196 (1977), if follows that there is a presumption a defendant is competent to stand trial. Using this implicit burden of proof and evidentiary standard within the competency statutes we hold that K.S.A. 22-3201 and K.S.A. 22-3202 are not unconstitutional." 263 Kan. at 70.

McKinney also contends that the statutes fail "to honor an accused's right to a meaningful hearing." His specific complaint is that the statute does not require psychological testing and that none was done in this case. McKinney asserts that basic testing procedures are necessary to an evaluation that would meet the standards of the scientific community, citing *State v. Warden*, 257 Kan. 94, 891 P.2d 1074 (1995), but that reliance must be mistaken. *Warden* involves questions of a young, impaired *victim's competence to testify*; Warden's competence to stand trial was not at issue.

McKinney concedes that in *State v. Green*, 245 Kan. 398, 412-13, 781 P.2d 678 (1989), the court held that competence to stand trial could be determined without the aid of a psychological or psychiatric evaluation. He contends, however, that the United States Supreme Court's subsequent decisions in *Medina* and *Cooper* require a different result. He argues that now a determination of competence to stand trial cannot be left "to the whim of indi-

vidual judges and mental health practitioners who fail to conduct a competent evaluation." He does not specify what it is in either of the Supreme Court opinions that supports his contention, and review of them does not reveal a basis. In fact, the Supreme Court's validating the states' practice of presuming a defendant's competence and placing the burden of proving otherwise on him or her seems to undermine the argument.

Defendant next contends that the jury should have been instructed on felony murder as a lesser included offense of premeditated first-degree murder. McKinney was charged with the first-degree premeditated murder of William Barnett. The district court instructed the jury on second-degree murder and voluntary manslaughter in addition to first-degree premeditated murder. On appeal, McKinney argues that the jury also should have been instructed on felony murder as a lesser included offense of first-degree premeditated murder.

K.S.A. 21-3401 provides:

"Murder in the first degree is the killing of a human being committed:
(a) Intentionally and with premeditation; or
(b) in the commission of, attempt to commit, or·flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto.
"Murder in the first degree is an off-grid person felony."

K.S.A. 21-3107 provides, in part:

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:
(a) A lesser degree of the same crime;
. . . .
(d) a crime necessarily proved if the crime charged were proved.
"(3) In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

McKinney contends that felony murder, although first-degree murder like premeditated murder, is a lesser degree of the same crime because the punishment for felony murder is lighter than that for premeditated murder. He points out that a defendant con-

victed of premeditated murder is eligible for a hard 40 sentence and is not eligible for parole before serving 25 years of a life sentence. K.S.A. 21-4635(a); K.S.A. 22-3717(b)(1). A defendant convicted of a felony, in contrast, is not eligible for a hard 40 sentence and is eligible for parole after serving 15 years of a life sentence. K.S.A. 21-4706(c); K.S.A. 22-3717(b)(2). The State simply asserts that a lighter punishment does not define a lesser offense. In *State v. Matson*, 260 Kan. 366, 372, 921 P.2d 790 (1996), we responded to a similar argument:

> "This reasoning is flawed. The availability of the hard 40 sentence for first-degree premeditated murder does not make that crime separate and distinct from first-degree felony murder for several reasons. First, the jury declined to impose the hard 40 sentence for the first-degree premeditated murder of Dale Pavey. Second, as to the murder of Julie Voyles, the jury did not consider the hard 40 sentence because the defendant was convicted of second-degree murder of Voyles, not first-degree murder. Finally, and most importantly, the hard 40 sentence is just that, a sentence—not a separate crime."

Felony murder is not a lesser degree of murder than premeditated murder. Felony murder is first-degree murder; premeditated murder is first-degree murder. This court has on numerous occasions held that premeditated and felony murder are not separate, distinct offenses but are two separate theories under which the crime of first-degree murder may be committed. In *Matson*, this court said:

> "The *Starr* court first observed that premeditated murder and felony murder are not separate and distinct crimes but rather are two different theories under which the crime of first-degree murder may be committed. The *Starr* court concluded that amending a charge of first-degree felony murder to include a charge of first-degree premeditated murder during trial is not charging an additional or different crime." 260 Kan. at 372.

Second-degree murder is an example of a lesser degree of premeditated murder.

Nor is felony murder necessarily proved if the crime charged—premeditated first-degree murder—were proved. The elements of premeditated murder are (1) that the defendant intentionally killed the victim and (2) that the killing was done with premeditation. PIK Crim. 3d 56.01 (1994 Supp.). The elements of

felony murder are (1) that the defendant killed the victim and (2) that the killing was done while defendant was in the commission of, attempting to commit, in flight from committing, or attempting to commit an inherently dangerous felony. PIK Crim. 3d 56.02 (1997 Supp.). Instead of its being a lesser included offense of premeditated first-degree murder, felony murder may be an alternative theory of the crime. The State may charge in the alternative and offer evidence to support both. There is a pattern instruction that, in these circumstances, must be given in addition to PIK Crim. 3d 56.01 and PIK Crim. 3d 56.02. It states, in part:

"In this case, the State has charged the defendant with one offense of murder in the first degree and has introduced evidence on two alternate theories of proving this crime.

"The State may prove murder in the first degree by proving beyond a reasonable doubt that the defendant killed [the victim] and that such killing was done while (in the commission of) (attempting to commit) (in flight from [committing] [attempting to commit]) [an inherently dangerous felony] or in the alternative by proving beyond a reasonable doubt that the defendant killed [the victim] intentionally and with premeditation, as fully set out in these instructions.

"Where evidence is presented on the two alternate theories of proving the crime charged, you must consider both in arriving at your verdict." PIK Crim. 3d 56.02-A.

There is no contention here that the State either charged or should have charged McKinney with felony murder in the alternative to premeditated murder. Nor does McKinney argue that the jury should have been instructed on premeditated murder and felony murder as alternative theories. Instead, he contends that "when a premeditated murder is charged and the killing occurs in the commission of an inherently dangerous felony, . . . an instruction on the lesser offense of felony murder must be given." He gives no authority for the proposition. He does not assert that defense counsel requested an instruction on the alternative theories, and he has not argued that K.S.A. 21-3107(3) creates an affirmative duty for the trial court to instruct on all alternative theories of guilt under the charges and upon the evidence adduced, with or without a request to do so.

It appears that both parties are trying to have it both ways in the district court. Defense counsel denied on the record that there was

any evidence that would support a finding that defendant entered Barnett's house for the purpose of robbing him. Although the State did not charge McKinney with felony murder or adduce evidence that would support a theory of felony murder, the State argued at sentencing that McKinney killed Barnett for financial gain and that he killed him to avoid being caught for the aggravated robbery. The trial judge rejected the first of these proposed aggravating factors. He agreed with defense counsel, who said, "There's absolutely no evidence in the case that indicates that he went in and killed Mr. Barnett to get money."

We next consider defendant's argument that the evidence was insufficient to support the conviction of aggravated robbery of Barnett. In contrast to his argument on felony murder, McKinney contends for the purpose of this issue that "there is absolutely no evidence to support the finding that the forced [*sic*] used to harm Mr. Barnett was done to assist in completing a robbery."

"When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt." *State v. Evans*, 251 Kan. 132, Syl. ¶ 1, 834 P.2d 335 (1992).

K.S.A. 21-3426 provides as follows: "Robbery is the taking of property from the person or presence of another by force . . . ." K.S.A. 21-3427 provides: "Aggravated robbery is a robbery . . . committed by a person . . . who inflicts bodily harm upon any person in the course of such robbery."

McKinney contends that the evidence showed that his taking the murder victim's property was an afterthought. In other words, he contends that there is no evidence that he intended to rob Barnett at the time he killed him. Instead, McKinney contends, the evidence showed that he killed Barnett and then decided to take the dead man's wallet and clip of money. McKinney notes that at the time of sentencing, the trial court declined to find the aggravating circumstance that the killing was committed for financial gain.

The State relies on *State v. Patterson*, 243 Kan. 262, 755 P.2d 551 (1988), and *State v. Myers*, 230 Kan. 697, 640 P.2d 1245 (1982), to discredit McKinney's contention that taking the murder

victim's property as an afterthought does not constitute the offense of aggravated robbery. In *Myers*, the court put to rest the contention that the intent for the force and the taking of property must coincide in time. The following rule was established:

"Under factual circumstances where a defendant shoots his victim and later decides to take and remove the victim's personal belongings and where the act of force and the taking of the property are so connected as to form a continuous chain of events so that the prior force makes it possible for the defendant to take property from the victim's body without resistance, that is sufficient for a conviction of the crime of robbery." 230 Kan. 697, Syl. ¶ 2.

Thus, even assuming that robbing the victim did not occur to McKinney until after he killed Barnett, the undenied continuity of events established the essential elements of aggravated robbery.

McKinney argues, in the alternative, that the trial court should have instructed the jury on the lesser included offense of theft. In similar factual circumstances in *Evans*, 251 Kan. 132, this court rejected the same argument on the ground that the evidence excluded a theory of guilt of theft. The evidence showed that Barnett was subjected to lethal bodily harm and his property was taken. The absence of any element of bodily harm for theft removes that offense from consideration. 251 Kan. at 137-38. *Evans* controls, and defendant's argument is without merit.

Defendant next argues that the jury should have been instructed on theft as a lesser included offense of robbery of Glenda Evans' purse. McKinney told police that he had snatched Mrs. Evans' purse from her arm, but he denied pushing her. For this incident, he was charged with robbery. In McKinney's view, his statements warranted the trial court's giving an instruction on the lesser included offense of theft. The State's position is that McKinney's snatching the purse away from Evans constituted the threat of bodily harm, which is an element of robbery. Thus, the State argues, even in defendant's version of the incident, the evidence excludes a theory of guilt of theft. This is correct.

The court's reasoning in *State v. Aldershof*, 220 Kan. 798, 556 P.2d 371 (1976), is instructive in this matter. In that case, tavern patrons' purses were taken off their table during a power outage. Defendant was charged with and convicted of robbery. This court

reversed on the ground that the offense at most was theft because no force or threat was used in the taking. The court declared that "[r]obbery is not committed where the thief has gained peaceable possession of the property." 220 Kan. 798, Syl. ¶ 3. The flip side of the coin is that theft is not committed where the thief has used force to gain possession of the property. We find no merit in defendant's argument.

Defendant next claims it was error for the trial court to permit a psychiatrist who had previously treated defendant to give rebuttal testimony for the State when defense counsel had not been given advance notice or been furnished her report. Defendant presented an insanity defense through the trial testimony of his witness, Dr. Robert Schulman, a general clinical psychologist. Schulman met with McKinney for approximately 3 hours on December 13, 1995, and administered psychological examinations to determine, among other things, McKinney's "level and degree of mental illness." Schulman also reviewed some records of McKinney's past psychiatric hospitalizations.

With regard to the responses McKinney gave to Rorschach images, Dr. Schulman testified:

> "This is the record of an individual who is suffering psychotic illness [i]n spite of the medication that [he is] taking[.] [I]t's not quite floridly psychotic but if he was using the medication that he had indicated, one would have thought that he would have had himself under better control and been able to produce a more productive and integrated record."

Regarding a word association test, Schulman testified that McKinney's responses suggested an "undercurrent of sexual problems." His responses on a sentence completion test suggested to Schulman "something about the inner schizophrenic life for him being more comforting than the real world." Schulman concluded that McKinney "had a psychotic illness[,] most likely paranoid schizophrenia." Schulman testified that paranoid schizophrenic persons usually do not know the difference between right and wrong. He was of the opinion that the manner in which McKinney killed Barnett reflected McKinney's psychosis and that he was not sane when he snatched Mrs. Evans' purse.

Dr. Roy Lacoursiere, a psychiatrist who had examined McKinney for the prosecution, concluded that he was a malingerer, "[s]omeone who was feigning an illness." Dr. Schulman testified that he did not agree with Lacoursiere's conclusion. Schulman noted that McKinney had been hospitalized and examined on many different occasions by many different professionals and that a number of different opinions had been expressed about his mental state. McKinney had been called, for example, schizophrenic, schizoaffective, and psychotic not otherwise distinguished, and he had been diagnosed with psychosis, bipolar disorder, alcoholism, and borderline personality disorder. According to Schulman, McKinney has "had every diagnosis—nearly every diagnosis that you can think of."

Elaborating on his diagnosis of McKinney as suffering from paranoid schizophrenia, Dr. Schulman offered the opinion that McKinney had "been continuously ill since about 1992 . . . . He has had the signs and symptoms of schizophrenia over a long period of time." Schulman believed that McKinney had "been totally dysfunctional most of his life probably[,] but certainly within the last three or four years."

The defense rested after Dr. Schulman's testimony, and the State was permitted to call Dr. Nasim Osman as a rebuttal witness. Defense counsel objected on the grounds that the prosecutor failed to give advance notice that he intended to call Osman and failed to furnish a report of what she was expected to say. Osman was McKinney's treating psychiatrist during his hospitalization at Osawatomie State Hospital, which ended only a few days before McKinney killed Barnett. The prosecutor told the trial court that he wanted to call Osman for the sole purpose of disputing Schulman's testimony that McKinney had been schizophrenic continuously for several years before killing Barnett.

The following facts were adduced during Dr. Osman's brief direct examination: McKinney was admitted to Osawatomie State Hospital for the 11th time on July 2, 1995. He was discharged on September 18, 1995. Osman was his treating physician during that hospitalization. Her diagnosis of McKinney "was alcohol dependence and antisocial personality disorder." She did not see him ex-

hibit symptoms of schizophrenia. On cross-examination, Osman testified that she saw McKinney 34 times during his hospitalization from July to September 1995 and that a staff psychologist administered psychological tests to McKinney and discussed the results with her.

McKinney argues that the trial court's permitting Dr. Osman to testify violated his right to notice under the Due Process Clause of the Fourteenth Amendment and his right to cross-examination under the Sixth Amendment. The notice required for due process, however, is of the possibility of being deprived of life, liberty, or property. It is not notice of a rebuttal witness. McKinney's Sixth Amendment complaint is not that he was unable to cross-examine Osman. He did cross-examine her. His general complaint is that "the lack of notice prevented defense counsel from adequately preparing his cross-examination." The specifics he cites, however, pertain to aspects of her testifying that may have created some difficulties in cross-examining her. The specific complaints do *not* pertain to advance preparation for cross-examining her. McKinney states, "She did not have her records with her and was not able to respond to counsel's questions concerning the nature or extent of her observations. She was unable to respond to counsel's questions concerning testing done at Osawatomie on Scott."

There is no suggestion in the appellant's brief that defense counsel was unaware of Dr. Osman's treatment and diagnosis of McKinney. It would be reasonable to assume that defense counsel's preparation for trial included obtaining and studying the medical records from McKinney's hospitalization that ended immediately before he killed Barnett.

In addition to making his constitutional contentions, McKinney quotes K.S.A. 22-3219 and *State v. Pyle*, 216 Kan. 423, 441-42, 532 P.2d 1309 (1975). Both are concerned with the requirements for a defendant's establishing an insanity defense. Neither touches on any conditions or requirements for prosecution witnesses called for the purpose of rebutting defendant's evidence on mental disease or defect. McKinney states that the prosecution "*should be required* to disclose to the defense any experts it intends to rely upon to negate the defense of mental illness," but he does not represent

to the court that such a requirement exists in statutory or case law form.

On the subject of rebuttal evidence, this court has stated:

"Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts the witnesses on the opposite side, but also corroborates previous testimony. The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice." *State v. Prouse*, 244 Kan. 292, Syl. ¶ 2, 767 P.2d 1308 (1989).

In the present case, defendant has not shown abuse of the trial court's discretion.

Defendant's final issue is to the sufficiency of the evidence to support the two aggravating factors relied on by the trial court in imposing the hard 40 sentence. The sentencing judge found that McKinney had killed Barnett "in order to avoid or prevent lawful arrest or prosecution" and "in an especially heinous, atrocious and cruel manner."

"When the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt." *State v. Brady*, 261 Kan. 109, Syl. ¶ 4, 929 P.2d 132 (1996).

In finding that McKinney killed Barnett in order to avoid prosecution, the trial court relied primarily on testimony of Special Agent Williams. McKinney told the agent that he had gone to Barnett's house, got into a confrontation with Barnett, grabbed him, knocked him to the floor, and strangled him until Barnett seemed to have stopped breathing. McKinney told Williams that he got up to leave and, as he was going out the door, Barnett yelled his name. McKinney then saw that Barnett was getting up off the floor. McKinney told Williams that he went back at that time and stabbed Barnett because he was afraid of being arrested and charged with the initial assault. The trial court also noted that McKinney had

told Dr. Lacoursiere the same story—that he went back to kill Barnett because he was afraid of being prosecuted for the initial assault.

On appeal, McKinney contends that the evidence is conflicting. He asserts that the taped statement he gave to Special Agent Williams does not contain an admission that he returned to kill Barnett out of fear of being prosecuted for the initial assault. Williams' trial testimony was that McKinney did not give avoiding prosecution for assault as his reason for killing Barnett until after he had given his taped statements. Williams testified that he taped two statements from McKinney before booking him. Then Williams took McKinney to the courtroom for his first appearance. At that time Williams asked, among other things, "why he had gone back after he started to leave the house." Williams testified that McKinney first responded that he "had gone back to help" Barnett. When Williams expressed disbelief, McKinney said that he "didn't want to get in trouble." McKinney "[s]tated he went back so that Mr. Barnett would not be able to report the previous struggle that they had had." Williams was asked if that was the reason McKinney had given him for killing Barnett, and he said that it was.

McKinney also argues that his desire to avoid arrest or prosecution was not "the main or even a substantial motivation for the killing." Conceding that this court has never interpreted K.S.A. 21-4625(5) so that avoiding prosecution must be the main or substantial motive for the murder, McKinney urges this court to follow the example set by other states' courts and establish this rule, citing decisions from Florida, Illinois, Nebraska, and North Carolina for the proposition that "[k]illing to avoid arrest or prosecution must be the motivational force behind the murder to justify the imposition of the Hard 40." The State has not bothered to respond to defendant's argument. The cases from other states are death penalty cases. In this regard, McKinney cites *State v. Willis*, 254 Kan. 119, 864 P.2d 1198 (1993), as representing this court's "retreat" from the earlier view that death penalty cases had limited precedential value for hard 40 sentencing. McKinney's brief was filed before this court's opinion was filed in *State v. Spain*, 263 Kan. 708, 953 P.2d 1004 (1998). Spain urged this court to reconsider its

stated view that the reasoning in cases involving capital punishment is not fully applicable to hard 40 sentences. Among the cases cited by Spain was *Willis*. The court declined to do so in the following words: "A body of case law has been developed for the hard 40, and those cases are governing precedents for the present case." 263 Kan. at 710. As in *Spain*, there is no need in the present case to go beyond established case law in order to adjudicate the case before the court.

In *State v. Reed*, 256 Kan. 547, 886 P.2d 854 (1994), Reed was convicted of murdering a teenaged girl after he drove her to the country to rape her. The jury found that he murdered her in order to avoid being prosecuted for the sexual assault. On appeal, Reed argued that evidence of his concealing the victim's body was related to his attempt to avoid being prosecuted for the murder rather than for the sexual assault. The majority of the court was of the opinion that the evidence related to avoiding prosecution for both the sexual offense and for the murder: "His actions, if concealment of the body had been successful, would have avoided or prevented a lawful arrest or prosecution for kidnapping or attempted rape." 256 Kan. at 566. Here, there is a great deal more evidence, especially McKinney's admission to Special Agent Williams, to support the aggravating circumstances, than just the murderer's actions following the murder. After reviewing all the evidence, viewed in a light favorable to the State, we conclude the evidence was sufficient to support the trial court's finding the existence of this aggravating circumstance.

The trial court also found the murder was committed in an especially heinous, atrocious, or cruel manner. McKinney's main argument is that his choking the victim, banging his head, repeatedly puncturing him in the throat for many minutes while Barnett was saying his attacker's name and audibly swallowing blood and eventually asphyxiating from a combination of compression of his airway and the stab wounds was not heinous, atrocious, or cruel in manner.

McKinney's first contention seems to be that, by killing Barnett this way, he inflicted neither serious mental anguish nor serious physical abuse before the victim's death. The evidence, however,

shows that Barnett called out, "Scott," a number of times and that he endured 20 puncture wounds with scissors and a kitchen knife as well as choking and the banging of his head. This would seem to be evidence of the victim's suffering serious mental anguish and serious physical abuse.

McKinney also contends that there was no evidence that he intended for Barnett to suffer. He argues that his bungling of the killing does not make it heinous, atrocious, or cruel in manner. He cites cases from other states for the proposition that an especially heinous, atrocious, or cruel murder occurs only where the killers relished torturing or inflicting unnecessary pain on the victim. He does not cite any Kansas cases to this effect, however. The instruction that has been adopted by this court for defining this aggravated circumstance for a jury may provide some guidance in the present case even though the trial court made the findings in the present case:

> "The defendant committed the crime in an especially heinous, atrocious, or cruel manner. The term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.
> "A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate." *Willis*, 254 Kan. 119, Syl. ¶ 4.

The focus for the Kansas aggravating circumstance seems to be on the suffering of the victim rather than on the defendant's sadism. Although the two may more often than not go hand-in-hand, the law in this state does not seem to require the latter where the former is present.

McKinney also cites case law from other states for the proposition that this aggravating circumstance may not be found where "the victim is possibly unconscious during the infliction of wounds." McKinney has supplied no Kansas authority for the rule he advocates that would take the question of the victim's conscious suffering away from the factfinder. Moreover, he has cited no Kansas authority for the proposition that a showing of serious physical

abuse of an unconscious victim would not adequately support this aggravating circumstance. With serious mental anguish stated in the disjunctive with serious physical abuse, it would appear that one without the other is sufficient.

As a final matter, McKinney argues that his returning to kill Barnett when he realized that he had not killed him during the initial assault cannot be used as evidence to support this aggravating circumstance because it was used as evidence of premeditation and intent to kill. The fatal weakness of this argument is that Mc-Kinney's returning to "finish off" the victim was peripheral, at most, to the trial court's decision. The trial court's findings on this aggravating circumstance dwell on the length of time the victim suffered attack by McKinney and consequently must have feared for his life, the number of puncture wounds, and the ferocity of the blows. Only after extensively reviewing evidence of the victim's mental and physical suffering did the trial court even mention McKinney's returning to kill him. Only after concluding that Barnett suffered horribly did the trial judge turn his attention to McKinney's cold-bloodedness:

"I note that all murders are heinous, atrocious and cruel, but I believe this one was egregiously so. Mr. McKinney, the defendant, certainly had the ability to flee or leave the premises. Never was he restrained by the victim. Never was the victim necessarily fighting back. The defendant certainly at all times had the ability to leave and chose not to do so but chose to actually assault the victim on three separate occasions, caused his death in an extremely heinous and atrocious way by multiple stab wounds to the neck, none of which would be immediately fatal and all of which, added together in a cumulative sense, did cause the death of the victim, I believe, in a very cruel way."

We agree.

The judgment of the district court is affirmed.

ALLEGRUCCI, J., concurring and dissenting: I agree that the defendant's convictions should be affirmed. I also agree with the trial court's finding that the defendant committed the murder in an especially heinous, atrocious, and cruel manner. I disagree with the finding that the defendant killed Mr. Barnett to avoid arrest and prosecution for initially assaulting him.

The present case is distinguishable from *Reed*. Here, the only evidence to support the aggravating circumstance is McKinney's admission to Special Agent Williams. However, McKinney disputes he ever made the statement, and it is not on the tape.

We must review all of the evidence to determine the existence of an aggravating circumstance. Thus, even if we accept that McKinney made the statement, the problem is that he did not make the statement when initially describing how he killed Barnett, which is on the taped statement. In considering all the evidence, I do not find the evidence sufficient to support existence of this aggravating circumstance.

It is clear that McKinney intended to kill Barnett and not to just assault him. He continued to assault and batter Barnett until he was dead. McKinney initially got Barnett in a headlock for "fifteen, twenty minutes and finally he quit breathing." McKinney thought he was dead at that point and, when Barnett called his name, McKinney got him down again, choked him, and stabbed him repeatedly in the throat with scissors, and still Barnett did not die. McKinney then grabbed a steak knife and cut Barnett's throat. He still was not dead, so McKinney put "something over his face." Although we do not adopt defendant's suggestion that the killing to avoid arrest or prosecution must be the motivating force to commit the murder, it should be clear that it was not an afterthought or an incidental factor.

The evidence indicates that McKinney killed Barnett out of anger, rage, and emotional instability. Further, the crime for which the State contends he was avoiding arrest was the initial assault. This was a continuous offense of intentional murder, and the assault and battery were part of and merged with the murder. This court has long held that where the aggravated assault or battery results in the death of the victim, the defendant can only be charged with felony murder. The basis for our holding is that the initial aggravated assault or battery is not distinct from the homicide and merges with the homicide to constitute only one offense. It seems disingenuous to me to hold that the merger doctrine does not likewise apply in determining the existence of an aggravating circumstance. Since, in my view, there is only one aggravating cir-

cumstance, I would vacate the sentence and remand for the trial court to weigh the one aggravating circumstance against any mitigating circumstances and to resentence the defendant.

SIX and LARSON, JJ., join in the foregoing concurring and dissenting opinion.