# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 14, 2002 Session

## STATE OF TENNESSEE v. WADE P. TUCKER

**Appeal from the Circuit Court for Franklin County**
**No. 13166     J. Curtis Smith, Judge**

---

### No. M2001-02298-CCA-R3-CD - Filed July 17, 2002

---

The defendant, Wade P. Tucker, appeals from his Franklin County Circuit Court convictions of especially aggravated robbery and aggravated burglary. These convictions resulted from a bench trial in which the facts were stipulated by the defendant and the state. On appeal, the defendant challenges the sufficiency of the convicting evidence. We conclude that sufficient evidence supports the conviction of especially aggravated robbery; however, we hold that the conviction of aggravated burglary is infirm because the defendant, as an owner of the property, effectively consented to his entry into the house where the crime took place. Accordingly, we reverse and vacate the conviction of aggravated burglary but affirm the conviction of especially aggravated robbery.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Reversed and Vacated in Part;**
**Affirmed in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOE G. RILEY, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for the Appellant, Wade P. Tucker.

Paul G. Summers, Attorney General & Reporter; Helena Walton Yarbrough, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steve Blount, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Based upon the defendant's actions on January 23, 2000, the Franklin County Grand Jury indicted him for the attempted first-degree murder of his estranged wife, Debbie Tucker, the especially aggravated robbery of Ms. Tucker, and the especially aggravated burglary of the defendant's and Ms. Tucker's home in which Ms. Tucker was residing at the time. The defendant pleaded guilty to attempted first-degree premeditated murder and received a Range I sentence of 24 years in the Department of Correction, subject to a 30 percent release eligibility date. The defendant waived his right to trial by jury on the remaining counts, and he and the state submitted a stipulation

of facts to the court for a bench trial on especially aggravated robbery and especially aggravated burglary. Following the bench trial, the trial court convicted the defendant of especially aggravated robbery and aggravated burglary. On the aggravated burglary conviction, the trial court sentenced the defendant to a Range I term of five years, subject to a 30 percent release eligibility date. On the especially aggravated robbery conviction, the trial court sentenced the defendant to a term of 24 years in the Department of Correction, and based upon Tennessee Code Annotated section 40-35-501(i)'s designation of especially aggravated robbery as a violent offense, the court sentenced the defendant to serve 100 percent of the prescribed sentence. All sentences were imposed to run concurrently. On appeal, he challenges the sufficiency of the evidence for both the especially aggravated robbery and the aggravated burglary convictions.

The stipulation of facts revealed that the defendant and the victim were husband and wife. On November 19, 1999, the victim filed a divorce complaint in which she alleged that the defendant had been guilty of "inappropriate marital conduct and adultery." In the complaint, the victim sought custody of the parties' two minor children and asked that she be awarded, *inter alia*, the parties' jointly-owned house located on Rock Creek Road in Franklin County. As of January 23, 2000, the divorce was still pending, no property rights had been adjudicated, and the defendant was not subject to any order restraining him from going about the victim or the parties' house. The defendant resided at the Dripping Springs Subdivision home of his father, Gerald Tucker, and the victim resided at the Rock Creek Road house. Between November 19, 1999 and January 23, 2000, the defendant had been to the Rock Creek Road house on multiple occasions to pick up and drop off the parties' children. On the evening of January 22, 2000, the parties' children were staying at Gerald Tucker's home. Thus, on the night of January 22 and in the early morning hours of January 23, 2000, the victim was the only person staying at the Rock Creek Road house.

At approximately 2:30 a.m. on January 23, 2000, the victim awoke to gunfire and realized that she had been shot. She got up from her bed and was shot again. She saw "a male looking figure near her bedroom door holding a long-barreled gun." The victim fled to a closet, and the assailant, who was wearing a ski mask, came into the closet and shot her again. After the assailant left the closet, the victim crawled toward her bed to get the cordless telephone for the purpose of calling 911. Due to injuries to her hands and arms, she was unable to handle the phone and pushed it along the floor back to the closet. She heard sounds of the assailant moving about in the house. The victim was able to dial 911 with her tongue and ultimately reached the Franklin County Sheriff's Department dispatcher. While the victim was on the telephone, she saw the ski-masked intruder come back to the closet through the glow of the bathroom light. Despite the presence of the ski mask, the victim was able to recognize the intruder as the defendant. She screamed, and the defendant shot her again. The victim "played dead at that time." She heard the defendant in the bedroom opening drawers in her jewelry chest.

Franklin County officers arrived at the Rock Creek Road house pursuant to the 911 call and found the victim in the closet. She was transported to a hospital in Winchester and was ultimately air-lifted to a medical center in Chattanooga. The victim suffered "multiple gunshot wounds to her chest and neck area, and to her arms and hands." The stipulation of facts reveals that

the victim "was severely injured, with said injuries being life threatening [, resulting in her being] disfigured."

Both the defendant's and the victim's lives were insured by a Horace Mann Insurance Company life insurance policy which provided "that, if one of them died, the survivor would receive $300,000."

The officers obtained a sample of the victim's blood, and they recovered shotgun pellets from the victim's bed, the bedroom floor, the closet, the victim's night shirt, and the hospital trauma room where she was treated. The officers also recovered shotgun wadding from the bedroom area and from the victim's person. The officers found the victim's jewelry chest open and drawers pulled out of furniture throughout the house. An outside door was standing open with a window in the door broken. The officers obtained samples of glass from the door. They also found a live, twelve-gauge shotgun shell in the house.

Officers who were dispatched to Gerald Tucker's house arrived at 3:08 a.m. and found the defendant's truck parked outside the house with the "hood of the truck . . . hot to the touch." When the defendant's father led the officers to the defendant's room, "he actually crawled out of the bed and crawled on the floor before standing up with the assistance of his father." He appeared to the officers to be "very shaken."

With the consent of Gerald Tucker, the officers searched his house and found a twelve-gauge shotgun that, despite having been recently cleaned with oil, contained human blood and tissue inside the barrel. The DNA of the blood and tissue inside the shotgun barrel was consistent with the victim's DNA. The officers found particles of glass inside the defendant's truck which proved to be "like and consistent with respect to refractive index" to the glass broken from the door window at the Rock Creek Road house.

In a statement given to the officers, the defendant denied that he had gone to the victim's house and that he had shot her. He admitted to an intimate relationship with a woman named Sabrina Hodge.

On February 18, 2000, a neighbor of Gerald Tucker found a dark plastic bag in a wooded area near the road that leads to the defendant's father's house. Inside the bag, he found a wallet that contained the victim's identification papers. Being aware of the assault against the victim, the neighbor called the TBI. The TBI agent who took custody of the bag found inside, in addition to the wallet, numerous pieces of jewelry, coins, a ski mask, gloves, coveralls, and boots. The plastic bag also contained another plastic bag which contained "numerous love letters and cards" which had been sent to the defendant from Ms. Hodge. The second bag also contained "numerous photos of Sabrina Hodge in revealing underwear clothing."

The victim identified the wallet as hers and the jewelry and coins as her property that had been stored in her jewelry chest prior to the attack. The photographs bore the defendant's

fingerprints. The victim identified the ski mask as being similar to the one the defendant wore during the attack. The ski mask and gloves bore particles of glass which "were like and consistent with respect to refractive index" to the glass broken from the door. Furthermore, via DNA analysis, blood found on the ski mask matched the victim's blood. The coveralls from the bag contained five spent twelve-gauge shotgun-shell casings. Laboratory analysis revealed that all five shells had been fired from the twelve-gauge shotgun found at Gerald Tucker's house. Analysis of the empty shotgun casings found in the coveralls and the live twelve-gauge rounds found in the victim's house and in the defendant's truck revealed that all of the ammunition was "likely manufactured at the same time as each other and were likely packaged together by the manufacturer."

Based upon comparisons made between the pellet pattern of the twelve-gauge shotgun found in Gerald Tucker's house and the pellet pattern found in the victim's nightshirt, TBI laboratory personnel opined that she was shot on at least one occasion from a distance of less than ten feet.

Based upon these stipulated facts, the trial court convicted the defendant of especially aggravated robbery and aggravated burglary.

On appeal from a conviction, the state is entitled to the strongest legitimate view of the evidence and "all reasonable or legitimate inferences which may be drawn therefrom." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992); *State v. Cabbage*, 571 S.W.2d 832, 835-36 (Tenn. 1978). Moreover, a verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace*, 493 S.W. 2d 474, 476 (Tenn. 1973); *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977), which the defendant has the burden of overcoming. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

Most significantly, when the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn R. App. P. 13; *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 2782 (1979); *see also State v. Williams*, 657 S.W.2d 405 (Tenn. 1983). This rule applies to findings based on both direct and circumstantial evidence. *State v. Thomas*, 755 S.W.2d 838, 842 (Tenn. Crim. App. 1988).

I. Especially Aggravated Robbery.

First we review the challenge to the evidence supporting the conviction of especially aggravated robbery. A person commits especially aggravated robbery who commits a robbery with a deadly weapon and when the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (1997). Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401(a) (1997). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*. § 39-14-103 (1997).

The trial court determined that

> [w]hether the defendant meant to only use the robbery of his wife's belongings to divert or confuse law enforcement agents . . . does not diminish the fact that (1) he planned his course of conduct in advance; (2) he knowingly took property from his wife's possession without her consent; (3) he accomplished this action by the use of a deadly weapon; (4) he caused his victim to suffer serious bodily injury as a result of his action; and (5) he substantially interfered with his wife's ability to possess and enjoy her property.

We glean from the defendant's brief that he maintains that he did not intend to take the victim's property when he shot her and, in any event, his purpose was to kill his wife, not to deprive her of her property. The state conversely argues that the "facts are undisputed that defendant obtained items that he knew belonged to Mrs. Tucker [and] was able to [do so] because he used a deadly weapon and caused Mrs. Tucker serious bodily injury."

Before analyzing the claim that the intent to steal the victim's property had not been formed at the time of the assaults, we briefly dispose of the claim that the defendant did not *intend to deprive the victim of her property*. The trial court essentially held that it was immaterial whether the defendant had a purpose of depriving the victim of her property. We agree. By inserting as an element of theft that the offender must obtain the property "with the intent to deprive the owner" of the property, the legislature obviously did not intend that the offender's *purpose* must be the owner's loss or deprivation. *See* Tenn. Code Ann. § 39-14-103 (1997). If that were the meaning of the element of intent to deprive, almost no asportation of property would be proscribed by Code section 39-14-103. We judicially know that a thief's primary purpose is to profit or otherwise benefit from his ill-gotten gains; yet, we understand that such a purpose equates to an intent to deprive the owner of the stolen property for purposes of Code section 39-14-103. Thus, regardless of the ultimate motive or purpose, the offense is established when the evidence shows that the defendant intended to deprive the owner of property when the defendant knowingly obtained or exercised control over the property. *See* Tenn. Code Ann. § 39-14-103 (1997).

Now, we address the issue of whether the evidence of especially aggravated robbery is insufficient because the defendant may not have formed the intent to steal at the time he assaulted the victim. We organize our analysis into two steps: (a) whether an intent to steal that exists prior to or is contemporaneous to the assault is necessary or material to the crime of especially aggravated robbery; and (b) whether the fact-finder could reasonably infer that a prior or contemporaneous intent to steal existed.

(a)

In this part, we address whether it is material to a charge of especially aggravated robbery that the defendant may not have intended to steal the victim's property at the time he shot

her.  As is pertinent to the present case, the robbery statute requires that the defendant intentionally or knowingly steal property from another "*by* violence."  Tenn. Code Ann. § 39-13-401(a) (1997) (emphasis added).  When the robbery is accomplished with a deadly weapon and the victim suffers serious bodily injury, the offense becomes especially aggravated.  *Id.* § 39-13-403(a) (1997).  The statutes contain no express requirement that the purpose to steal must coincide with the violence or serious bodily injury or that the assault be for the purpose of theft.

The state relies upon *State v. Shawnda James*, No. 01C01-9803-CC-00093 (Tenn. Crim. App., Nashville, Aug. 11, 1999), *perm. app. denied* (Tenn. 2000), in which the defendant was convicted of first-degree, premeditated murder and especially aggravated robbery of the victim, despite her contention that, because the post-killing theft was an afterthought, she was guilty of mere theft and not especially aggravated robbery.  This court concluded that defendant James was able to steal the victim's property because she previously had shot and killed the victim.  *Id.*, slip op. at 13.  Essentially, the *Shawnda James* panel held that, based upon the taking of the victim's property in the wake of the murder, it was immaterial whether the defendant intended to commit theft when she shot the victim.

In *Shawnda James*, this court followed what has been characterized as the "traditional rule" that the state need not prove that the defendant assaulted the victim for the purpose of theft, when the proscriptive statute does not recite that the "force must be used for the purpose of committing the theft."  *See* 2 Wayne R. Lafave & Austin W. Scott, Substantive Criminal Law § 8.11 at 454 (1986).  Rather,  the nexus between the theft and the antecedent assault is supplied when the defendant merely exploits the victim's disabled condition by stealing the victim's property.  *Id.*; *accord State v. McKinney*, 265 Kan. 104, 1131, 961 P.2d 1, 7-8 (1998) ("Under factual cir-cumstances where a defendant shoots his victim and later decides to take and remove the victim's personal belongings and where the act of force and the taking of the property are so connected as to form a continuous chain of events so that the prior force makes it possible for the defendant to take property from the victim's body without resistance, that is sufficient for a conviction of the crime of robbery."); *State v. Mason*, 403 So.2d 701 (La. 1981) (holding that acts of violence need not have been for the purpose of taking the property); *Stebbing v. State*, 299 Md. 331, 353-54, 473 A.2d 903, 914-15 (1984) (holding that the taking of property still constituted a robbery even though the original attack may not have been committed for the purpose of taking the victim's property); *Chappell v. State*, 114 Nev. 1403, 1408, 72 P.2d 838, 841 (1998) ("[I]n robbery cases it is irrelevant when the intent to steal the property was formed.").  According to this view, whether the defendant had formed an intent to steal from the victim at the time of the assault may be immaterial to whether he committed robbery.

Even though the Tennessee robbery statute appears to accommodate this traditional rule and to be similar to the statutes in other jurisdictions where the traditional rule has been applied, and even though this court followed the traditional rule in *Shawnda James*, we must, at this juncture, determine the effect of our supreme court's decision in *State v. Buggs*, 995 S.W.2d 102 (Tenn. 1999), which arguably could be construed as holding that, to support robbery as a predicate offense to felony murder, the intent to steal must pre-exist or be concurrent with the assault.

In *Buggs*, a felony-murder case, the defendant stabbed his girlfriend to death after he "snapped" during an argument. *Id.* at 104. Afterward, he stole the victim's cash and used it to purchase cocaine. *Id.* Despite Buggs's characterization of the decision to steal the money as an "afterthought," *id.* at 103, our supreme court held that the evidence was sufficient to convict Buggs of felony murder – murder committed in the perpetration of a robbery. The court acknowledged that, in a felony-murder case, when the killing precedes the commission of the predicate felony, "there is a split of authority [among] the various jurisdictions as to *whether intent to commit the felony* must exist concurrent[ly] with the commission of the homicide, or whether intent formed after a killing is nonetheless sufficient to bring a case within the felony-murder rule." *Id.* at 106 (emphasis added). The *Buggs* court ultimately concluded that "for the felony-murder doctrine to be invoked, the actor must intend to commit the underlying felony at the time the killing occurs." *Id.* at 107. Despite this conclusion, the court held that the "jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit a felony prior to, or concurrent with, the killing." *Id.* at 108. In reviewing the facts in *Buggs*, the high court concluded that the jury could reasonably have inferred that Buggs formed an intent to kill the victim prior to or concurrently with the murderous act.

Thus, *in a felony-murder case* in which the predicate felony is robbery, *Buggs* requires that the intent to steal be formed prior to or concurrently with the assault upon the victim. Moreover, *Buggs* seems applicable in the present robbery case because, when the robbery victim dies, as she did in *Buggs*, a resulting felony-murder charge is baseless unless a robbery did occur. If *Buggs's* "prior to or concurrently with" rule applies as means of defining the *robbery* as a predicate to felony murder, it contradicts the traditional rule that, in applying a robbery statute such as Tennessee's, the force or violence used against the victim need not be for the purpose of theft.

We do not believe that *Buggs* changes the traditional rule when the charged offense is especially aggravated robbery, as opposed to felony murder. In our view, *Buggs* sets boundaries for defining an assault as murder, not an assault as an element of especially aggravated robbery. In *Buggs*, the high court carved out a special rule for felony-murder cases, "[g]iven the fact that the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder." *Id.* at 107. Based upon the legal-fiction nature of felony-murder theory, the court was "reluctant" to reject a requirement that the intent to commit the underlying felony must exist prior to or concurrently with the lethal assault. *Id.* Indeed, the predicate felony in *Buggs* was mere robbery; an injury to the victim was not a required element of this predicate offense, and there was no need to analyze the culpability for the injury as a means of finding the elements of the predicate offense. The court was examining the culpability for the homicide. As such, *Buggs's* "prior to or concurrently with" rule has no application in an especially aggravated robbery prosecution.

With the rationale in *Buggs* being limited to prosecutions for felony murder, we hold that *Shawnda James* controls. The result is that the intent to steal need not exist prior to or

concurrently with the shooting in a case in which the defendant is charged with especially aggravated robbery.

(b)

Despite our conclusion that the intent to steal need not have existed prior to or contemporaneously with the assault in order to support a conviction of especially aggravated robbery, we consider the issue of whether such an intent on the defendant's part was reasonably inferred from the evidence. We conclude that the trial court's inference that the defendant intended to steal the victim's property when he entered the dwelling is reasonably supported by the stipulated facts and that, on appellate review, we are not free to infer otherwise.

The aspect of *Buggs* that *is* applicable to the present case is the holding that, when the assault precedes the act of theft, a jury may reasonably infer from a defendant's actions immediately after an assault that the defendant intended to commit the theft prior to, or concurrently with, the assault. *See Buggs*, 995 S.W.2d at 108. We must ascertain, however, whether the rule is applicable when the inference was drawn not by a jury but by a trial court and when the basis for the inference is a statement of stipulated facts.

In a case in which all of the adjudicative facts are stipulated by the parties and there are neither bases for factual contradiction nor issues of credibility, it may be that the appellate court is in the same position as the trial court to review the facts as presented. *See, e.g., State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000) ("[W]hen a court's findings of fact at a suppression hearing are based solely on evidence that does not involve issues of credibility, such as the videotape evidence [of the DUI encounter] in this case, the rationale underlying a more deferential standard of review is not implicated."). The stipulated facts presented in this case, however, are not, by the very nature of the stipulation, at issue; rather, the conflicting *inferences* which may be drawn from these facts frame the issue.

The defendant argued forcefully that the trial court should infer from the facts, including the abandonment of the plastic bag containing the victim's property, that he entered the Rock Creek Road house on the morning of January 23, 2000 for the purpose of killing his wife and that he later took the jewelry only for the purpose of misleading the police into believing that an intruder entered the house to commit a robbery.

Unfortunately for the defendant, the trial court inferred that the defendant went to the house with a preconceived plan to kill the victim and to steal the jewelry if only as a means of confounding the police. We cannot say that this inculpating inference lacked a basis in fact. The defendant spent some time in the house while the victim painstakingly retrieved the cordless telephone and called 911. After his rummaging through the house, he returned to find the victim on the telephone and fired the shotgun at her again from close range. She feigned being dead, and he immediately opened the jewelry chest.

-8-

We conclude that the trial court was free to draw inferences from the stipulated facts, *State v. Pruett*, 788 S.W.2d 559, 560 (Tenn. 1990), and that its inferences were reasonable and supported by the facts. *See generally Buggs*, 995 S.W.2d at 108. Moreover, on appeal, our review of the convicting evidence is the same whether the conviction was wrought by the hands of a jury or a trial judge. *See* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *cf.* Tenn. R. App. P. 13(d) (In civil cases, appellate review standard of a trial court's findings of fact is *de novo* accompanied by a presumption of correctness; however, the standard of review of a jury verdict is that the verdict will stand if material evidence supports it.). Even in a case of stipulated facts, we view the evidence in the light most favorable to the state, including "all reasonable and legitimate inferences which may be drawn [from the evidence]." *See Cabbage*, 571 S.W.2d at 835-36; *Pruett*, 788 S.W.2d at 560-61 (appellate court may not substitute its own inferences for the inferences drawn by a trier of fact, even though the facts were stipulated by the parties).

Thus, we are constrained to accept the trial court's inference because the trial court was the fact-finder, and the inference it drew was reasonable and the one most favorable to the state. As a result, even if an intent to steal that pre-exists or is contemporaneous with the assault was necessary to a conviction of especially aggravated robbery, we find that the evidence sufficiently supports the conviction.

## II. Aggravated Burglary.

Now, we address the defendant's challenge to his aggravated burglary conviction. One commits burglary who, "without the effective consent of the property owner . . . [e]nters a building and commits or attempts to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a)(3) (1997). Burglary becomes aggravated burglary when the building is a habitation. *Id.* § 39-14-403(a) (1997). A "habitation" is defined as "any structure, including buildings, modular units, motor homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." *Id.* § 39-14-401(1)(A) (Supp. 2001). For purposes of the burglary statutes, an "owner" refers to "a person in lawful possession of property, whether the possession is actual or constructive." *Id.* § 39-14-401(3). The definition of "owner" does not "include a person, who is restrained from the property or habitation by a valid court order or order of protection other than an ex parte order of protection, obtained by the person maintaining residence on the property." *Id.*

The issue that we must resolve is whether the defendant, as a joint proprietor of the house on Rock Creek Road who had not been restrained or enjoined from the premises, may be convicted of burglarizing that house. We hold that because he, as an owner, effectively consented to his own entry, he committed no burglary.

The parties owned the Rock Creek Road house jointly. Unless some restriction or variation in the form of ownership between husband and wife was imposed by the deed or instrument

that conveyed title, which restriction or variation does not appear in the appellate record, the parties, as husband and wife, presumptively held title to the house as tenants by the entirety. *See Weaver v. Hamrick*, 907 S.W.2d 385, 388 (Tenn. 1995); *Preston v. Smith,* 41 Tenn. App. 222, —, 293 S.W.2d 51, 59 (1955). A tenancy by the entirety is characterized by a "unity of interest, [a] unity of title, [a] unity of time, and [a] unity of possession; or, in other words, joint tenants have one and the same interest . . . held by one and the same undivided possession." *Id.* The tenants by the entirety, "the husband and wife as a unit[,] have the right to the current use and enjoyment of the property." *Weaver*, 907 S.W.2d at 388; *see Robinson v. Trousdale County*, 516 S.W.2d 626, 632 (Tenn. 1974).

Because the defendant's and the victim's property rights in the house had not yet been adjudicated by the divorce court on January 23, 2000, we conclude that the defendant, as a tenant by the entirety, had an equal right with the victim to possess or use the house. In this circumstance, his entry must be viewed as consensual *for purposes of the burglary statute*, which makes the lack of "effective consent of the property *owner*" the linchpin for proscribing an entry. *See* Tenn. Code Ann. § 39-14-402(a) (1997) (emphasis added); *see also State v. Langford*, 994 S.W.2d 126, 128 (Tenn. 1999) (defendant who was former boyfriend of burglary victim not in "lawful possession" of victim's premises; even though defendant formerly stayed with the victim he had no proprietary interest in premises).

Furthermore, because the defendant was not under any restraining or protective order commanding him to stay away from the house, he was not excluded as an owner for purposes of the burglary statute. *See id*. § 39-14-401(3) (Supp. 2001). In creating an exclusion from the definition of an owner, the legislature circumscribed a class that is defined by being subject to a valid court restraining or protective order, not a class that includes persons who are merely estranged spouses.

Thus, the conviction of aggravated burglary must be reversed, and that charge must be dismissed. The conviction of especially aggravated robbery is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE